MATTEL, INC., a Delaware
corporation, Plaintiff,

v.

MCA RECORDS, INC., a California
corporation, et al., Defendants.

No. CV 97–6791–WMB (RNBx).

United States District Court,
C.D. California.

Aug. 3, 1998.

Adrian M. Pruetz, Christopher Tayback, Adam D. Samuels, Quinn, Emanuel, Urquhart & Oliver, Los Angeles, CA, for Plaintiff.

Russell J. Frackman, George M. Borkowski, Jeffrey D. Goldman, Brent Rabowsky, Mitchell, Silberberg & Knupp, LLP, Los Angeles, CA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS, GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANTS' COUNTERCLAIM, AND DENYING DEFENDANTS' MOTION TO DISMISS

WM. MATTHEW BYRNE, Jr., District Judge.

In March, 1997, a Danish musical group known as "Aqua" released in Europe an eleven-song album, *Aquarium.* This album included a song entitled *Barbie Girl,* in which a woman and man assume the identities of two popular Mattel dolls known as Barbie and Ken. Defendants claim this song parodies the popular toys, with the singers referring to Barbie as a "blond bimbo girl" who loves to party and whose "life is plastic." *Barbie Girl* quickly became a hit in Europe and later was released in the United States,

where the *Aquarium* album sold over 1.4 million compact discs (CDs) and cassettes.

On September 11, 1997, Mattel filed suit in this Court, bringing eleven claims [1] against MCA and other defendants.[2] Defendants, in turn, filed a counterclaim for defamation. On February 19, 1998, this Court denied plaintiff's motion for a preliminary injunction, on the grounds that it was not likely to succeed on the merits.[3]

Defendants now move for summary judgment; they also seek to dismiss the foreign defendants for lack of subject matter jurisdiction, personal jurisdiction, and forum non conveniens.

Plaintiff moves for summary judgment as to defendants' counterclaim for defamation and request reconsideration of the Court's earlier Order denying a preliminary injunction. Although plaintiff did not file a formal cross-motion for summary judgment on its own claims, during the hearing on April 30, 1998, plaintiff's counsel orally requested that the Court grant summary judgment for Mattel rather than defendants.

At the hearing, the Court advised the parties that, because the pre-trial and trial dates were approaching, it would issue a brief order on the motions, followed by this more detailed order.

## I. MCA'S MOTION TO DISMISS FOREIGN DEFENDANTS

MCA Records is a California corporation that sells Aqua's album in the United States. Universal Music & Video Distribution Inc. is a New York corporation that distributes the album in the United States. This Court's jurisdiction over those two defendants is not contested. Three foreign defendants have also been sued by Mattel, and those three

defendants have filed a motion to dismiss the case against them for lack of personal jurisdiction. All three foreign defendants are affiliated members of the Universal Music Group. (Pl.'s Ex. H.) All three have an active and on-going relationship with each other. (Cacciatore Dep.; Bowen Dep.)

Universal Music A/S is a Danish corporation ("Universal Denmark"). Aqua recorded the album in Denmark and is party to a recording agreement with Universal Denmark that gives Universal Denmark the worldwide rights to the Aqua album. Universal Denmark has a preexisting agreement with MCA Records that gives MCA the rights to Aqua and other bands for distribution in all countries except Denmark. Universal Denmark collects a license fee for all sales of the album in the United States. MCA Music Scandinavia A/B ("MCA Scandinavia") is a Swedish corporation. Through an agreement with Universal Denmark, it owns the music publishing rights to the words and the music of the *Barbie Girl* song. It receives money from the sale of Aqua's album anywhere in the world, including those sold in the United States. (Ingestrom Dep. at 40–42.)

Universal Music International, Ltd. ("UMI") is a British holding company that has no rights to the song or to the album. It acts to coordinate information among various international, affiliated companies. However, it does coordinate the release of various musical products by its affiliates all over the world, including in the United States. (Bowen Dep. at 18–23.) Universal Music International then helps "coordinate touring activities and promotional activities" of the released records, including Aqua in the United States and elsewhere around the world. (*Id.* at 31.) It also sent the *Barbie*

---

1. The claims are (1) trademark and trade dress dilution (under state and federal law), (2) trademark infringement, (3) false designation of origin and false description, (4) statutory and common law unfair competition, (5) unfair competition under the Paris Convention, (6) wrongful use of a registered mark; (7) common law misappropriation; (8) common law passing-off and disparagement; (9) common law unjust enrichment; (10) contributory trademark and trade dress dilution (under state and federal law), and (11) contributory trademark and trade dress infringement.

2. Mattel did not sue the musical group Aqua.

3. Mattel's proposed preliminary injunction asked that this Court enjoin defendants from manufacturing, producing, or distributing the *Barbie Girl* song. It also requested that this Court require defendants to "dispos[e] or destroy[ ] any product or its packaging, which uses Mattel's BARBIE trade name." (Pl.'s Proposed Order at 3).

*Girl* video to MCA in the United States. (*Id.* at 35.) UMI worked with Universal Denmark to market the Aqua album in the United States and rest of the world. (*Id.* at 42–71.)

### A. LIMITED JURISDICTION [4]

The Ninth Circuit has adopted "the following three-pronged approach to analyzing limited jurisdiction: (1) The nonresident defendant must do some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. (2) The claim must be one which arises out of or results from the defendant's forum-related activities. (3) Exercise of jurisdiction must be reasonable." *Pacific Atlantic Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir.1985).

■ The Ninth Circuit utilizes seven factors under the third prong of the limited jurisdiction test to determine whether the exercise of jurisdiction is reasonable. *See Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981). The following seven factors are relevant: "(A) the extent of the purposeful interjection into the forum state; (B) the burden on the defendant of defending in the forum; (C) the extent of conflict with the sovereignty of defendant's state; (D) the forum state's interest in adjudicating the dispute; (E) the most efficient judicial resolution of the controversy; (F) the importance of the forum to plaintiff's interest in convenient and effective relief; and (G) the existence of an alternative forum." *Id.*

#### 1. Purposeful Availment

■ Defendants argue that the foreign defendants have no offices, employees, property, or agents in the forum, and they have not conducted any business in the forum. Defendants rely on *Asahi Metal Indus. Co. v. Superior Court*, for the proposition that "the placement of a product into the stream of commerce, without more, is not an act of the defendant purposely directed toward the forum state." 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

Defendants also rely on *Rano v. Sipa Press, Inc.*, 987 F.2d 580 (9th Cir.1993). In *Rano*, the plaintiff-copyright licensor of photographs sued a French licensee, asserting jurisdiction on the basis that the licensee knew that plaintiff's photographs ultimately would be distributed in California due to the licensee's sub-licensing of the photographs to various magazines. *Id.* at 583–84. The Ninth Circuit rejected an argument that would render all "foreign owners of art who sell their products to publications amenable to personal jurisdiction in every state in which their art is eventually displayed." *Id.* However, this case is distinguishable. The three foreign defendants did more than merely have their music product end up in California by happenstance. There were cross-licensing agreements between all of the members of the Universal Group. A coordinated plan existed among of all of the defendants to distribute the *Barbie Girl* song around the world, including the United States.

For example, the artwork for the *Barbie Girl* recording was delivered to MCA in Los Angles by Universal Denmark in conjunction with the single's release in the United States. (Wheeler Dep. at 45.) Universal Denmark also has exported single versions of the song to the United States. (*Id.* at 63–64; Cacciatore Dep. at 105.)

UMI coordinated the release of Aqua's album with all of the Universal affiliates around the world, including the United States. (Bowen Dep. at 16.) UMI helps determine which Universal record label, if any, should release a specific album into the United States. (*Id.* at 23.) As part of that process, UMI sent promotional copies of the *Barbie Girl* video to MCA in the United States. (*Id.* at 35.)

Universal Scandinavia operates under a sub-licensing agreement in the United States. (Ingestrom Dep. at 39.) Thus, un-

---

4. Plaintiff also contends that the foreign defendants are subject to general jurisdiction in the United States. Plaintiff has not shown that the foreign defendants have had sufficiently continuous or systematic contacts to warrant general jurisdiction.

der this sub-publishing agreement, Universal Scandinavia would receive royalties for each Aqua album sold in the United States. (*Id.* at 41.) There would also be royalty payments for each time a song was played on the radio. (*Id.* at 41–42.) MCA Scandinavia sent albums to the United States to their affiliates in the United States for publicity in the hopes of getting the Aqua album used in commercials or other commercial ventures. (*Id.* at 46–49.)

All of the above contacts show sufficient purposeful availment of the United States by the foreign defendants. The district court cases upon which defendants rely are also distinguishable. In none of them do the defendants actually intend for their activities to have any effect in the forum. Here, the foreign defendants had an intent to affect the forum. Their licensing agreements, and coordination of the release strategies for the Aqua album, coupled with their sending of promotional products to the forum, suggest purposeful availment of the forum.

2. Claim Arises from Forum Activities

Defendants argue that the foreign defendants have no meaningful forum-related activities with respect to the claims in this lawsuit. Defendants contend that the foreign defendants do not manufacture, sell or distribute the album in the United States. However, the foreign defendants' conduct facilitates the activities that occurred in the United States. If plaintiff's claims are true, then the foreign defendants participated actively in the scheme that brought the *Barbie Girl* song to the United States.

3. Exercise of Jurisdiction Is Reasonable

a. Extent of Purposeful Interjection into Forum

■ Defendants rely on *FDIC v. British–American Ins. Co.* for the proposition that a contract is an insufficient basis to establish purposeful interjection into the forum. 828 F.2d 1439, 1443 (9th Cir.1987). However, in *FDIC,* the governing law of the contract was expressly not the law of the forum, and there were no activities in the forum other than using a forum bank to handle the one-time transaction. *Id.* In this case, there was far more activity directed at the forum than

mere temporary physical presence, as in *FDIC.* The contacts with the forum included the sending of promotional singles of *Barbie Girl* into the U.S., and the coordinating of the release of the album in the U.S., as well as receiving royalties from sales of the album in the U.S. Such contacts constitute far more contact than the "random" or "fortuitous" contact envisioned in *FDIC.*

b. Burden on Defendants to Defend in Forum

Defendants rely on the Ninth Circuit's claim that "we have held that litigation against an alien defendant requires a higher jurisdictional barrier than litigation against a citizen from a sister state." *Rano,* 987 F.2d at 588. Defendants further argue that witnesses and documents are in Europe, which means that the California forum is burdensome. However, the Ninth Circuit has also noted that "the burden of litigating in a foreign forum has become less significant as a result of advances in communication and transportation." *FDIC,* 828 F.2d at 1444. Thus, while it may be somewhat of a burden for the foreign defendants to defend in California, it does not appear to be unreasonably so.

c. Extent of Conflict with Sovereignty of Defendants' Respective States

■ Defendants argue that Danish and Swedish trademark remedies are more limited than those available under U.S. law, and judgements in the U.S. are unlikely to be enforced in either country. "Although not a dispositive consideration, a foreign nation presents a higher sovereignty barrier than another state within the United States." *Id.* at 1444. Plaintiff notes that there is no parallel foreign action so there is no risk of inconsistent verdicts. In addition, such a conflict is not dispositive, or else legal action against foreigners in U.S. courts would almost always be prohibited. "Sovereignty concerns weigh more heavily when the defendants have no United States based relationships." *Core–Vent v. Nobel Indus.,* 11 F.3d 1482, 1489 (9th Cir.1993). In this case, the fact that all of the foreign defendants are wholly-owned subsidiaries of Universal, and the fact that they have all directed actions at

the forum state, make the exercise of jurisdiction reasonable.

### d. Forum State's Interest

Defendants argue that the forum state's interest can be secured merely by proceeding against the two U.S. defendants. Plaintiff claims that Mattel and Universal Studios are both domiciled in California. Plaintiff also points to the fact that most documents and witnesses are located in the forum. Defendants claim that the foreign defendants' allegedly infringing conduct occurred outside the forum. However, as discussed previously, the foreign defendants engaged in conduct directed at the forum, and were a part of the allegedly infringing conduct that took part in the forum. "California maintains a strong interest in providing an effective means of redress for its residents who are tortuously injured." *Id.*, 11 F.3d at 1489. Since Mattel is a California resident, California has an interest in resolving this dispute.

### e. Efficient Judicial Resolution

"In evaluating this factor [the Ninth Circuit] has looked primarily at where the witnesses and the evidence are likely to be located." *Id.* Defendants claim that all of its employees are located in Europe, so it would be difficult to bring them to the forum for trial. Plaintiff claims that the majority of witnesses and documents are located in the forum. Both sides provide only conclusory statements here, so it is difficult to evaluate their respective positions.

### f. Importance of Forum to Plaintiff's Interest in Relief

While plaintiff would prefer to litigate in California because it is domiciled there, that is not dispositive. Wherever this case is litigated, some parties will have less convenience than others. Plaintiff argues that since its case raises U.S. trademark law, it is more convenient to have a U.S. court, who is familiar with U.S. law, hear the case. This factor does not tilt the balance either way.

### g. Existence of Alternative Forum

Defendants claim that Mattel has the burden to prove that there is not an alternative forum. *See Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 853 (9th Cir. 1993). Defendants argue that plaintiff could bring this suit in Denmark or Sweden. However, as plaintiff points out, defendants go to great pains to argue that there would be no cause of action in this case in either Sweden or Denmark under their law. Thus, there does not appear to be an alternative forum for this type of trademark suit.

### 4. Conclusion

■ This Court has personal jurisdiction over the foreign defendants. The foreign defendants are wholly-owned subsidiaries of Universal, and they have participated in numerous actions directed at the forum state in this case.

### B. LANHAM ACT EXTRATERRITORIALITY

■ In order to apply the Lanham Act to foreign commerce "first, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; and third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority." *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1395 (9th Cir.1985). The third element involves seven factors: "the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged if conduct within the United States as compared with conduct abroad." *Id.*

### 1. Effect on American Foreign Commerce

■ Defendants rely on *Zenger–Miller, Inc. v. Training Team, GmbH*, 757 F.Supp. 1062 (N.D.Cal.1991). In *Zenger–Miller,* the defendant was a German corporation that conducted no business in the United States,

such that the Court found that the effect on U.S. commerce was minimal, as plaintiff felt most of the effects in its European business. *Id.* at 1071. Defendants claim that the foreign defendants in this case made money from activities in foreign counties targeted at foreign consumers, and not from targeting consumers in the U.S.

*Zenger–Miller* is distinguishable because in this case, the foreign defendants have directed activity at the United States and have derived profits from their activities in the United States. Plaintiff notes that the Ninth Circuit does recognize that "the Lanham Act provides a broad jurisdictional grant that extends to all commerce which may lawfully be regulated by Congress." *Ocean Garden, Inc. v. Marktrade Co.,* Inc., 953 F.2d 500, 503 (9th Cir.1991). The court also noted that "the sale of infringing goods in a foreign country may have a sufficient effect on commerce to invoke Lanham Act jurisdiction." *Id.* In this case, the foreign defendants participated in activities resulting in sales of *Barbie Girl* in the United States, as well as abroad. Jurisdiction therefore exists.

### 2. Effect Great Enough to Present Cognizable Injury

■ Defendants argue that any injury suffered by plaintiff would be suffered abroad. However, plaintiff argues that defendants' conduct has caused plaintiff injury in the United States. As long as there is "monetary injury in the United States" to plaintiff, then there is a "cognizable [claim] under the Lanham Act." *Id.* at 503. In this case, the foreign defendants' actions have caused an injury in the United States, sufficient to establish jurisdiction by allegedly infringing plaintiff's trademark.

### 3. Interests of American Commerce Sufficiently Strong

#### a. Degree of Conflict with Foreign Law

■ Defendants argue that under Danish law, plaintiff would have a more difficult time making its claim for trademark infringement or unfair competition. (Madsen Dec.) In addition, a U.S. judgement would not be enforceable in Danish courts. (*Id.*) Defendants argue that the same would be true in a Swedish court. *See Blimpie Int'l, Inc. v. ICA Menyforetagen AB,* 1997 WL 143907 (S.D.N.Y.1997). Plaintiff claims that this fact is irrelevant because it is not proceeding under foreign trademark law, but rather is seeking to enforce U.S. trademark law.

Plaintiff argues that since there is no current foreign proceeding, there can be no conflict with foreign law. The Ninth Circuit has noted that if "there are no pending proceedings" abroad, then it would not "be an affront to the foreign country's sovereignty or law." *Ocean Garden,* 953 F.2d at 503. Since there are no proceedings currently in Sweden or Denmark, and because the conduct complained of impacts the U.S. market, there is no real sovereign conflict.

#### b. The Nationality or Allegiance of the Parties

In this case plaintiff is a California corporation and the foreign defendants are not. However, the foreign defendants are very closely related to the U.S. defendants because they are all owned by the same corporate entity and act as each others' agents.

#### c. Extent by Which Enforcement by Either State Achieves Compliance

Defendants argue that this Court's ruling would not be enforceable abroad. However, plaintiff is seeking damages and injunctive relief relating to activities within the U.S., which would be enforceable. Plaintiff is not seeking relief for defendants' sales of the *Barbie Girl* song in Europe; it is only seeking relief for United States sales. This Court could enforce its order against the foreign defendants' activities that target the U.S.

#### d. Relative Significance of Effects on the United States

Plaintiff claims that there has been a significant harm in the U.S. because of the high number of albums sold. There is certainly enough harm alleged to show significance of harm in the U.S.

#### e. Purpose to Harm or Affect U.S. Commerce

Defendants claim that they have caused no effect in the United States. However, the

evidence suggests that defendants have engaged in activities targeting the United States.

### f. Foreseeability of Such Effect

Since the other factors come out in plaintiff's favor, defendants' actions were thus foreseeable. *See id.* at 504.

### g. Relative Importance to Violations Charged

Plaintiff is a U.S. corporation, and has been harmed in the United States. That is sufficient for this factor. *See id.*

### 4. Conclusion

█ There have been sufficient activities geared toward the United States, and sufficient impact in the United States for there to be a cause of action under the Lanham Act.[5]

## C. FORUM NON CONVENIENS

█ "A party moving to dismiss on grounds of forum non conveniens must show two things: (1) the existence of an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal. This showing must overcome the great deference due plaintiffs because a showing of convenience by a party who has sued in his home forum will usually outweigh the inconvenience the defendant may have shown." *Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 767 (9th Cir.1991). Ordinarily the requirement of an alternative forum is satisfied if "the defendant is amenable to process in the other jurisdiction." *Id.* at 768. However, the requirement may not be satisfied "in rare circumstances where the remedy offered by the other forum is clearly unsatisfactory." *Id.* "Private interest factors include: ease of access to sources of proof; compulsory process to obtain the attendance of hostile witnesses, and the costs of transporting friendly witnesses; and other problems that interfere with an expeditious trial." *Id.* at 769. "Public interest factors encompass court congestion, the local interest in resolving the controversy, and the preference for having a forum apply a law with which it is familiar." *Id.* at 771.

### 1. Existence of an Adequate Alternative Forum

Defendants contend that plaintiff could litigate its claims in Denmark, Sweden or Great Britain where it claims to have trademark registration. Plaintiff contends that this case involves conduct that occurred in the United States. Therefore, those claims should be litigated in the U.S.

### 2. Balance of Private and Public Interest Factors

Plaintiff points out that the Ninth Circuit has cautioned that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gates Learjet Co. v. Jensen,* 743 F.2d 1325, 1334–35 (9th Cir.1984).

### a. Private Interest Factors

Defendants argue that since *Barbie Girl* was created and initially packaged in Denmark, and since the foreign defendants activities were limited to Europe, that the balance of private factors tilts toward requiring that the case be prosecuted in Europe. In addition, all witnesses and documents relating to the foreign defendants are located in Europe. There will be a high cost to bringing witnesses from Europe, and this Court cannot compel witnesses from Europe to appear in Court. Finally, defendants contend that any judgement in this Court would not be enforceable in Sweden or Denmark.

The Ninth Circuit has also recognized that while a U.S. citizen has no absolute right to sue in a U.S. forum, "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum." *Jensen,* 743 F.2d at 1335. Here, Mattel, a citizen of California, is suing in its home forum.

Additionally, the Ninth Circuit requires district courts to consider "that trial preparation had progressed nearly to the point of trial" when attempting to determine whether trial in the U.S. is "more easy, expeditious and inexpensive" than trial abroad. *Id.* at 1335. Here, most discovery has been com-

---

5. Plaintiff also claims jurisdiction under the Paris Convention. However, the Court finds that there is no private cause of action under the Paris Convention.

pleted, and the foreign defendants have been actively participating in the case in this Court. Thus, it does not make sense to dismiss them on the eve of trial.

Finally, in looking at where witnesses are located, the court must "keep in mind that the increased speed and ease of travel and communication makes . . . no forum as inconvenient today as it was in 1947." *Id.* at 1336. Additionally, the Court should consider not merely the number of witnesses and their locations, but the "materiality and importance of the anticipated witnesses' testimony." *Id.* at 1335.

### b. Public Interest Factors

Defendants contend that plaintiff has unnecessarily complicated this case with the addition of the foreign defendants, which contributes to a congested court system. California has little interest in resolving any claims against the foreign defendants. Finally, defendants argue that the issue of whether they infringed any trademarks should be determined under the law of the country where the conduct took place, in Europe.

The Ninth Circuit has recognized that U.S. courts have an interest in "protecting its companies from trademark infringement abroad to preserve the state's economic vitality." *Id.* at 1336. In examining the court's docket "the real issue is not whether a dismissal will reduce a court's congestion but whether a trial may be speedier in another court because of its less crowded docket." *Id.* at 1337.

In short, there has not been a sufficient showing to overcome the presumption that plaintiff's choice of forum is the appropriate one.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are deemed "material" if a dispute over them "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Id.* at 256, 106 S.Ct. 2505. If the moving party satisfies this burden, Rule 56(e) provides:

> When a motion for summary judgment is made and supported as provided for in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

In addition, summary judgment is appropriate, "after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

### B. EVIDENTIARY OBJECTIONS

#### 1. The Cogan Survey

 Plaintiff submitted with its opposition a survey, prepared by Dr. Sandra Cogan, which includes the responses of 556 individuals interviewed in person at ten shopping malls in six states and purports to show actual confusion among consumers.[6] Defen-

---

**6.** The individuals surveyed included men 14 to 49 years of age and women 6 to 49 years of age

dants object that the survey is inherently biased with leading questions and that it is excludible as improper opinion testimony under Federal Rule of Evidence 703.

The Ninth Circuit has held that "surveys are to be admitted as long as they are conducted according to accepted principles." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir.1992). "Technical unreliability goes to the weight accorded a survey, not its admissibility." *Id.* (quoting *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir.1982)). The mere presentation of a survey purporting to show confusion, however, does not itself create a triable issue of fact. *See Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir.1984) (finding a survey "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion.").

In *Gallo*, the district court admitted a survey in which participants were shown photographs of defendant's cheese label and asked a series of questions, the first being what company "puts out this cheese." The other two questions asked participants to identify what other products they thought were made by the company they identified in their first answer. *Id.* The survey found forty percent of participants were confused nationally, with 47% confused in California. *Id.* at 1292–93. *See also Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d 352, 357–58 (7th Cir.1983) (finding that the survey question, "who do you think puts out [the product] shown here," to be valid, "[a]lthough the phraseology may not be the best way to ask the question").

The Cogan survey includes a number of questions that circuits courts have found to be inherently leading or biased and therefore should be given little if any weight as evidence of actual confusion. In addition, the

few neutral questions presented by the survey show only a minimal amount of consumer confusion. *Cf. Universal City*, 746 F.2d at 118 ("[T]he fact that there may be a few confused consumers does not create a sufficiently disputed issue of fact regarding likelihood of confusion so as to make summary judgment improper.").

Survey participants either watched a video or listened to an audio recording of the song. They were then asked what the music video or music "is about." Cogan did not tally the answers of the participants, although an independent review of the participants' answers reveals that about 421, or 76%, of the individuals explicitly identified the song as about Barbie.[7]

The survey conductors then showed either the CD album or the CD single to the participants and asked to "look at this music CD as though you were in a store and thinking about buying a music CD today." (Cogan Decl., Ex. C, at 11). The survey takers then asked the following question:

"3. Who or what company, if any, do you think is connected with or gave permission for the music video and CD (the music CD) you just saw?"[8]

If a name was given, participants were then asked why they thought that and what other products were put out by that named company. By Cogan's count, 20% answered Universal/MCA/Aqua/ or Barbie Girl, 17% answered Barbie/Mattel, 6% answered Music/Entertainment Co., and 47% answered that they did not know.

It is unclear from the results of this question how many individuals who answered Mattel thought the company was "connected" with the song and how many thought the company gave its permission. The use of the term "connected with" is not relevant in the context of parody, as parodies evoke the object that they are poking fun of and there-

---

"who have listened to English language rock/pop music on the radio, watched an English language rock/pop music video station on television, and/or bought an English language rock/pop tape or CD in the past year." (*Id.*, Ex. C, at 14–15).

7. Defendants state that 80 percent of those surveyed thought the song was about "Barbie." (Defs.' Objections at 4).

8. Defendants claim that the third question is leading and suggestion, because the participants are more likely to assume from the prior question that there is a connection or that permission is required because the survey-takers are asking about it.

fore are often linked or connected to that object in the public's mind.[9] *See Prudential Ins.*, 694 F.2d at 1156 (holding that the exclusion of a survey, which showed 14–31 percent of the public identified plaintiff's logo with defendant's, was not prejudicial error "because the survey showed only that the Prudential rock [logo] and the Gibraltar rock [logo] are linked in the public eye"); *see also Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (observing that parody in the copyright context "can claim legitimacy for some appropriation" of the original work on which it comments).

The next question (# 5) was "who or what company or companies do you think put out the music video and CD (music video) you just saw." Twenty-one (21)% said Universal/MCA/Aqua or Barbie Girl; 4% said Mattel or Barbie; 11% said a Music/Entertainment Co.; and 60% said that they did not know. These results indicate substantially less confusion than seen in the *Gallo* survey.[10] *See* 967 F.2d at 1292–93.

In calculating her results, Cogan inexplicably combines the responses from question three (17.4%) and question five (2.3%)[11] to find that 20% of the respondents "though Mattel or 'Barbie' was the source, connected with, or gave permission for the 'Barbie Girl' music video and/or music CD." (*Id.* at 17). It is unclear why Cogan combines the answers to questions three and five, as both questions were asked to all 556 participants. Cogan points to no evidence that the individuals in question three who thought Mattel was connected with the song were a different group of people than the smaller number in question five who thought Mattel put out the music video and CD.

The Cogan survey conductors then asked the following series of questions:

7a. Do you associate the Barbie Girl name with any other products?

7b. What products do you associate the Barbie Girl name with?

7c. Do you associate the Barbie Girl name on the CD package with the Barbie doll?

7d. Do you think the company which owns the Barbie doll brand gave its permission to use the Barbie name on the music CD package?

(Cogan, Ex. C, at 19). To the last question, 39% of respondents answered yes to the last question, 51% answered no, and 10% were not sure. The validity of the results from this leading question is undermined, however, by the fact that, when asked a relatively more neutral question (who is connected with or gave permission for this music), only 17% identified Mattel or Barbie.

*Universal City* is instructive on this point. In that case, plaintiff asked survey participants whether "the Donkey Kong game [was] made with the approval or under the authority of the people who produce the King Kong movies?" 746 F.2d at 118. The Court criticized the question, among other reasons, because "the above-mentioned inquiry was an obvious leading question in that it suggested

---

**9.** A claim for federal trademark infringement arises when a person's use of a symbol or word "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A) (1998).

The term "connection," however, has multiple meanings and its use in a survey question raises issues of what respondents mean when they agree that two products are "connected." For example, Blacks' Law Dictionary defines the word "connect" to mean, alternatively, "to associate as in occurrence or in idea" and "to establish a bond or relation between." Black's Law Dictionary 302 (6th ed., 1990). All parodies make associations between the parody and the

objects of the parody, yet that does not mean the viewers or listeners also believe that a relationship or bond exists between the maker of the parody and the maker of the object being parodied.

**10.** Defendants argue that question five, standing alone, would be appropriate. *See Gallo*, 967 F.2d at 1292 (valid survey's first question was "what company puts out" defendant's product). It also contends that there is no case in which only four percent confusion has been found to create a triable issue of fact.

**11.** It is unclear from where the 2.3% figure came, as Cogan's summary lists 4% of respondents answering "Mattel/Barbie" to question five.

its own answer. The participants were presented with the Donkey Kong–King Kong connection rather than permitted to make their own associations. . . . A survey question which begs its answer cannot be a true indicator of the likelihood of consumer confusion." *Id.* For the same reasons, this Court will not give weight to question "7d" as evidence of actual confusion.[12]

Defendants object that the survey is fatally flawed. They claim that the very first question, asking what the song was about, polluted the survey because the song is clearly about Barbie and therefore the survey takers "implanted" the Barbie response in the respondent's minds. (Defs.' Obj. at 4). Defendants note that most of the survey respondents indicated that the song was about Barbie—a result that is not surprising as the song is a parody of the doll. (*See* discussion below).

Defendants also object that plaintiff did not use a control group to take account of those respondents who are confused "regardless of the stimuli present."[13] *See Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F.Supp. 1454, 1475–76 (D.Kan.1996) (discounting survey showing 48–58 percent confusion where the survey contained only "numbers that had not been adjusted to account for noise in the market"). Defendants further argue that the single presented to the participants was the Danish version of the song (which lacks the disclaimer) rather than the American version, which has the disclaimer.[14] (See Defs.' Obj. at 10 (citing Cogan Decl., Ex. C, at 272)).

Although the survey contains flaws, "technical unreliability" goes to the weight the Court is to afford the survey, rather than its admissibility. *Gallo*, 967 F.2d at 1292. In evaluating plaintiff's case, the Court can consider these flaws when considering the multiple factors of the likelihood of confusion test.

### 2. The Luther Telephone Survey

Plaintiff also seeks to introduce a survey designed by one of its employees, Sujata Luther, the head of Mattel's Worldwide Consumer and Sales Research department. This survey of 1009 girls ages 5 to 18 years old purports to show that 77% of girls ages 8 to 10 and 49% of girls ages 5 to 7 had heard the song. It also claims that 52% of 5 to 10 years olds like the song "a lot," while only 20% of 11 to 18 year olds liked it "a lot." (Pl.'s Opp'n at 11; Pruetz Decl., Ex. I). However, the survey's relevance is unclear: whether young girls like the song does not demonstrate that they are confused over the trademark. As to showing the age of MCA's consumers, the survey does not indicate whether these listeners are likely to be the actual purchasers of this music.[15] Presumably, many parents buy toys and music products for their younger children, and plaintiff presents no evidence that more easily impressionable children, rather than adults, are the individuals who are buying the products at issue here.

### 3. Other Objections

Plaintiff objects to the declarations of Valerie Folkes, Richard Lanham, Soren Rasted, and Astrid Hansen in their entirety and to portions of the declarations of Bruce Wheeler and Jeffrey Goldman. Plaintiff argues that

---

**12.** In addition, a series of questions such as 7a–7d may "contaminate the respondent's mind . . . to give answers by preceding questions." *Henri's Food Products*, 717 F.2d at 357 (quoting testimony of expert and agreeing that survey was biased).

**13.** Plaintiff responds in a supplemental declaration that, to counter "noise" in the survey, the Cogan survey-takers made follow-up calls to twenty-five percent of respondents to verify that they had participated in the survey. (Cogan Supp.Decl. at ¶ 4).

**14.** Plaintiff responds that, because defendants would not provide a version of the single originally sold in the United States in August, 1997,

"the only BARBIE GIRL CD single recordings available in the U.S. marketplace when Dr. Cogan conducted her survey in January and February of this year were import versions." (Pl.'s Reply, [Renewed] Mot. for Prel.Inj., at 13). Plaintiff does not specify where in the U.S. marketplace these songs were sold, although it appears they were purchased over the Internet and imported into this country. (*See* Samuels Supp. Decl., Ex. J.–T).

**15.** As to ownership of the song, the survey shows that 14% of the girls owned the song. (Pruetz Decl., Ex. I, at 267). Of those individuals, 74% owned the album *Aquarium* and 26% owned the single *Barbie Girl*. (*Id.* at 268).

Lanham's credentials as a literary consultant are irrelevant "because Mattel did not bring suit against Aqua for the lyrics of its song." (Pl.'s Obj. at 2). This objection is without merit. Lanham's testimony relates to the meaning of the song's lyrics and its place among other parodies of plaintiff's doll.

Plaintiff objects to the Folkes Declaration because Folkes has "no experience in evaluating the merits of trademark infringement or dilution claims" and she apparently made certain factual errors in her declaration. (*Id.* at 3). Folkes, a marketing professor, provides some helpful testimony, however, regarding the widespread use of pink among products targeting young girls.

As to Hansen's declaration, plaintiff objects because he translates a Danish-language radio interview that plaintiff asserts is irrelevant and that includes comments made by a European Mattel official who stated publicly that the company was "all for" the song because it was "funny and good." (*Id.* at 4; *see also* Rasted Decl. at ¶ 14). However, the interview also contains comments by the songwriter about the meaning of the song, which relates to parody.

As to Rasted, the individual who wrote *Barbie Girl,* plaintiff claims that he has been unavailable for a deposition because he has been traveling overseas, "under contract to defendants."[16] (*Id.* at 5). Despite this, however, plaintiff has managed to produce in its opposition evidence that it claims contradicts Rasted's testimony regarding the meaning of the song. In addition, to exclude his testimony might potentially limit defendants' ability to explain the meaning of their own songs, although the lyrics themselves indicate that the song is a light-hearted comment on the dolls Barbie and Ken. (*See* discussion below).

The Court will not exclude the objected-to declarations.

### C. *BARBIE GIRL* AS PARODY

▬ The crux of plaintiff's argument is that defendants have misappropriated the Barbie trademark by using the word "Bar-

bie" in the song *Barbie Girl* and its video. Plaintiff claims that this song will lead to confusion among consumers and harm to the Barbie product line itself. Defendants respond, however that Barbie is an icon in American culture and that their alleged parody of her is protected by the First Amendment.

"The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see also Rendish v. City of Tacoma,* 123 F.3d 1216, 1223 (9th Cir.1997), *reh'g en banc denied,* 134 F.3d 1389 (9th Cir.1998). In this case, this Court must determine whether the song at issue constitutes a parody, thereby raising important First Amendment interests. *See Dr. Seuss Enterprises, L.P. v. Penguin Books,* 109 F.3d 1394, 1400 (9th Cir.) (observing that parody has "socially significant value as free speech under the First Amendment"), *cert. denied,* —— U.S. ——, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997); *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 28 (1st Cir.) ("Parody is a humorous form of social commentary and literary criticism that dates back as far as Greek antiquity."), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987); *Fisher v. Dees,* 794 F.2d 432, 437–38 (9th Cir.1986) (" 'Destructive' parodies play an important role in social and literary criticisms and thus merit protection even though they may discourage or discredit an original author.").

▬ As a threshold matter, the fact a parody makes a profit does not strip it of protection under the First Amendment. The Supreme Court has held that speech "is protected [by the First Amendment] even though it is carried in a form that is 'sold' for profit, and even though it may involve a solicitation to purchase or otherwise pay or contribute money." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 761, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (citations omitted). As the Tenth Circuit observed in analyzing the

---

**16.** Defendants have likewise accused plaintiff of making it difficult to interview some of *its* overseas witnesses.

First Amendment rights of trading cards that parodied famous sports players,

> [W]e see no principled distinction between speech and merchandise that informs our First Amendment analysis. The fact that expressive materials are sold neither renders the speech unprotected, nor alters the level of protection under the First Amendment. [Plaintiff] need not give away its trading cards in order to bring them within the ambit of the First Amendment.[17]

*Cardtoons L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959, 970 (10th Cir. 1996). Nor does a for-profit parody have to identify itself clearly as a parody. As the Supreme Court observed, "[p]arody serves its goals whether labeled or not, and there is no reason to require parody to state the obvious (or even the reasonably perceived)." *Acuff–Rose,* 510 U.S. at 583 n. 17, 114 S.Ct. 1164.

In the song *Barbie Girl,* two singers (one female, one male) adopt the names of "Barbie" and "Ken" and sing about their "life in plastic." The names "Barbie" and "Ken" also apply to two popular plastic dolls owned by the plaintiff. A portion of the lyrics sung by Lene Grawford Nystrom, who adopts Barbie's persona, includes the following:

> I'm a Barbie girl, in a Barbie world; life is plastic; it's fantastic
>
> You can brush my hair, undress me everywhere.
>
> Imagination; Life is your Creation....
>
> I'm a blond bimbo girl, in a fantasy world.
>
> Dress me up, make it tight. I'm your dolly....

René Dif, who plays Ken, sings the refrain, "Come on Barbie; Let's go party," throughout the song, which lasts just over three minutes.

Although the singers adopt the names of the dolls, they do not adopt their likeness, either on the album cover or in the related video. The lead singer impersonating Barbie, Nystrom, has dark hair and a tattoo on her arm. The male singer, Dif, has a clean-shaven head. Neither of these singers match the usual images of Barbie as a blond young woman or Ken as a young man with a full head of hair.

Plaintiff describes the song as containing "adult-oriented lyrics" that are inconsistent with Mattel's "wholesome image." Plaintiff specifically objects to phrases sung by the pretend Barbie such as "undress me everywhere," "I'm a blond bimbo girl, in a fantasy world"; "you can touch, you can play, if you say 'I'm always yours,'" and "make me talk, do whatever you please, I can act like a star, I can beg on my knees." Plaintiff also objects to Ken's lyrics, which include "kiss me here, touch me there, hanky panky" and "come jump in, bimbo friend, let use do it again, hit the town, fool around, let's go party."

Mattel's distaste for the song's alleged message, of course, cannot alone justify silencing speech critical of its product. *Cf. New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 307 (9th Cir. 1992) (noting the potential for injury to public discourse if individuals cannot refer to specific trademarks in their social commentaries). Indeed, parody "inevitably offends others" because it so often "ridicule[s] sacred verities and prevailing mores." *L.L. Bean,* 811 F.2d at 28; *see also Dr. Seuss,* 109 F.3d at 1400 n. 8 (noting that courts should "not take into account whether [an alleged parody] is in good or bad taste").

Plaintiff asserts that this song is not about the doll at all and that therefore cannot be a parody.[18] A review of the song and video,

17. As Samuel Johnson noted, "No man but a blockhead ever wrote, except for money." *Acuff–Rose,* 510 U.S. at 584, 114 S.Ct. 1164 (quoting 3 Boswell's Life of Johnson 19 (G. Hill ed.1934)).

18. *But see* Pl.'s Second Am.Compl. at ¶ 29 (noting that "one of the vocal tracts is sung by Lene Grawford Nystrom, who is called and assumes the role of the 'Barbie' in the song"); Pl.'s Mot. for Prel.Inj., at 7 (stating that, "[i]n the song, a promiscuous BARBIE doll sings in a flirtatious tone" and that "[a] licentious KEN doll responds 'kiss me here, touch me there'"); *id.* at 8 (referring *to* defendants' "overt references to Mattel's BARBIE doll"); Pl.'s Opp'n to S.J. at 7 (referring to the "promiscuous BARBIE" and "licentious KEN" in the song); *id.* at 8 ("The video features the Ken doll dismembering the Barbie doll by pulling off her arm.").

however, demonstrates that the singers are poking fun at Barbie, whom they repeatedly refer to throughout the song.[19] The lyrics spoof the unrealness of Barbie, referring to what many children apparently do with their dolls, including dressing and undressing them, brushing their hair, and making them walk and talk.[20] (*See, e.g.*, Lanham Decl., ¶ 38). In the video, the pretend Ken pulls the pretend Barbie's arm off; the singers, playing with a fake-looking arm, appear to be poking fun at the fact that Barbie, like all dolls, can be taken apart by her more adventuresome owners. (*See id.* at ¶ 45). In addition, the song's lyrics appear to target for parody a woman who is like Barbie—i.e. a Barbie Girl—one who is plastic, unreal, and easily manipulable by others.

The song's fast tempo and the singers' exaggerated performances of their respective characters suggest that the lyrics are not to be taken too seriously. As to the meaning of the lyrics, Soren Rasted—a member of Aqua and the song's "primary writer"—states that he wanted "to compose a humorous song about the 'Barbie fantasy *world.*'" (Rasted Decl., ¶ 11) (emphasis in original). Rasted has explained in interviews that the song was about more than just the Barbie doll itself but also its "status[,] like the royal family, which is not to be tampered with." (*Id.* at ¶ 14). The fact that the criticism is light-hearted, rather than heavy-handed, does not lessen the speech's First Amendment protec-

tions. *See Cardtoons*, 95 F.3d at 969 (observing that parody trading cards "are no less protected [as speech] because they provide humorous rather than serious commentary"); *see also Winters v. New York*, 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840 (1948) (observing that speech that is entertainment is also protected by the First Amendment because "[t]he line between the informing and the entertaining is too elusive for the protection of that basic right").

Plaintiff cites several interviews with band members, in which they make statements such as "[t]he song isn't about the doll. We're making fun of the glamourous life," and "[w]e don't mean to harm the doll."[21] (*See* Pruetz Decl., Ex. F4–F5, at 231, 234). Mattel asserts that the song is not about parodying Barbie and therefore plaintiff cannot claim the protection of the First Amendment.[22]

Mattel, however, ignores other comments made by the band members in interviews, in which they state that they wanted "to make Barbie the kind of girl you think of, very high, very childish," (Pruetz Decl. at F3) and the comments of the song's writer that the song "is about a Barbie doll, but like most of our songs there is a deeper significance to it. Not that we have to be taken dead seriously, but the Barbie doll has a certain status like the royal family, which is not to be tampered with." (Rasted Decl., ¶ 14; *id.*, Ex. 8 at 49

---

**19.** Courts routinely review songs and other forms of speech to determine if they are parodies. *See Acuff–Rose*, 510 U.S. at 582, 114 S.Ct. 1164 ("We have less difficulty in finding [the] critical element in 2 Live Crew's song than the Court of Appeals did, although having found it we will not take the further step of evaluating its quality."); *Fisher*, 794 F.2d at 436 ("Although we have no illusions of musical expertise, it was clear to us that [defendant's] version [of a song] was intended to poke fun at the composers' song, and at [the original singer's] rather singular vocal range.").

**20.** Indeed, in a book copyrighted by Mattel about Barbie, the introduction states that "the first thing most children want to do to a doll is take off her clothes." (Rasted Decl., Ex. 15, at 113). It further notes that Barbie, a "buxom fashion queen[,] is often a creature tortured for effect. Her head pops off, fits back on, and does a 360–degree rotation." (*Id.* at 116).

**21.** Over the objection of defense counsel, plaintiff asked the senior vice president of marketing and sales at MCA Records, Jayne Simons, about her view of the meaning of the song. Simons stated that she believed "the song was just sort of a fun song about a guy and a girl on a date" and that she was not reminded of the Barbie doll when she listened to it. (Healy Decl., Ex. D, at 162:14–16, 163:8). Plaintiff fails to explain, however, how the views of this individual are relevant, when the lyrics of the song clearly poke fun at Barbie and Ken, the dolls. In addition, a review of plaintiff's own survey data shows that 76% of those questioned thought that the song was about Barbie. (Cogan Decl. at 36–77).

**22.** Mattel even suggests that the song could have been entitled "Party Girl," thereby avoiding any references to its product. This argument ignores that the song's lyrics poke fun at Barbie the doll and women like Barbie, not just "party girls" in general.

(quoting Dif as saying that *Barbie Girl* is a "happy song with humor and irony")). Indeed, the song's writer has stated repeatedly that he was inspired to write the song after riding his bike past a kitsch exhibit of Barbie dolls in his native Denmark. (Pruetz Decl, Ex. F5, at 234; Rasted Decl., ¶¶ 9–10). In addition, he noted the song is "not the normal duets we do on our albums, it's more like role playing." [23] (*Id.*).

From the lyrics of the song and the various comments by the Aqua band members, it appears that song was intended to parody both the doll itself *and* the shallow, plastic values she has come to represent in some circles.[24] Indeed, this song is not the first time that Mattel's product has been talked about because of its cultural significance: the doll "has been seen as feminist and antifeminist; as seductive and as wholesome; as intelligent and as a 'dumb blond.' Barbie has been hailed as a role model and condemned

as the cause of eating disorders." (Defs.' Mot. at 3).

Nor is this the first song to tweak the wholesome image that Mattel wants for its doll.[25] Plaintiff dismisses such criticism of its product as simply the view of a "few extremists," but this argument only emphasizes the fact that individuals disagree about the meaning and values associated with the doll (Pl.'s Opp'n at 7 n. 17)—a fact recognized in a book put out under Mattel's copyright just a few years ago.[26] Indeed, the Ninth Circuit recently observed that the Barbie trademark was an example of a fanciful mark that has "add[ed] to the splendor of our language by giving us new ways to express ourselves." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1132 (9th Cir.1998). The Court noted that, just as a "[l]ousy, mindless work is a McJob," and "[a] quick fix is a Band–Aid[,] Glitz and ditz make for a Barbie World." *Id.*

---

**23.** Mattel's claim that the song has nothing to do with the doll is further undermined by the very press articles from which it selectively quotes. For example, a September article in *Billboard* magazine described the song as "a quirky look at the Barbie doll and her pal Ken. Rene Difs [*sic*] raps as a frisky Ken, framing Lene Nystrom's itsy-bitsy voice of a vapid Barbie. The ironic humor and catchy melody comes through as the two play off each other." (Pruetz Decl., Ex. F1, at 221). *See also* Ex. F2 at 225 (describing the song as "a playfully naughty Euro-dance ditty on the private whims and desires of our plastic pal and her male mainstay, Ken").

Other member of the press, including music reviewers, have viewed the song as critical of the doll. *See, e.g.*, Rasted Decl., Ex. 8 at 38 (referring to the song as "a criminally funny sonic riff on the overendowed queen of pop culture"); *id.* at 41 (implying that the song "tart[s] up Barbie"); *id.* at 45 (describing the song as "ambiguous enough to be taken both as tribute to and criticism of the Barbie life" and as "demeaning to plastic dolls"); *id.* at 46 ("Aqua pokes fun at icon"); *id.* at 49 (quoting Mattel spokesman who claimed the song "portrays Barbie in a very negative and sexual manner"); *id.* at 54 (describing lyrics as "suggestive" and "tongue-in-cheek").

**24.** *See, e.g.*, Folkes Decl., Ex. 14 (listing about 70 articles and 13 books on the cultural significance of Barbie). The commentary on the doll includes such titles as "Barbie: Doll, Icon or Sexist Symbol" and "My Mentor, Barbie."

**25.** Defendant identifies at least ten "Barbie" songs in current release, including "More Beau-

tiful than Barbie," by The Jesus Lizard; "Bitterness Barbie," by Lunachicks; "The Wreck of the Barbie Ferrari," by John Hiatt; "Kenbarbielove," by Men Without Hats; and "Barbie," by David Wilcox. (Folkes Decl., Ex. 6).

The lyrics of these songs often contain disparaging comments regarding the doll, some more critical or vulgar than those in *Barbie Girl*. For example, Lunachicks question whether Barbie would be as popular if she had a mastectomy, age spots, or varicose veins. (*Id.* at 73). David Wilcox sings that Barbie "found a higher power over at Betty Ford, It was a vibrator and a ouija board." (*Id.* at 72).

**26.** In 1994, Mattel copyrighted a book entitled *The Art of Barbie* that discusses the image Barbie has acquired. (Rasted Decl, Ex. 15, at 113, 116). In the introduction, Jill McCorkle variously describes the doll as a "a buxom fashion queen," "a dream goddess," and "a sophisticated grown-up doll, a recipient of fantasies that involved far more than motherhood." (*Id.* at 113, 116). McCorkle also notes that she "often found Barbie to be a rather controversial topic" and that she admits that she has "in recent years found myself defending Barbie" because of the doll's unrealistic body proportions. (*Id.* at 115–116). Finally, McCorkle admits that "despite popular belief, ... there is no preordained role for Barbie, no 'guide to being a bimbo' that comes with the box." (*Id.* at 116). This book recognizes that the Barbie doll has different meanings to different people, not all of which are necessarily positive or wholesome.

Plaintiff makes the mistaken assumption however, that to warrant First Amendment protection, the song can only be about the doll and that if it has meaning beyond the doll, defendants are stripped of their First Amendment interests. Plaintiff purportedly bases this argument on the Ninth Circuit's decision in *Dr. Seuss*, in which the Court observed a distinction between "parody (in which the copyrighted work is the target) and satire (in which the copyrighted work is merely a vehicle to poke fun at another target)." 109 F.3d at 1400. The Court made this distinction in the context of copyright infringement, in which the defendants' book copied the distinctive "stove-pipe hat" worn by a feline character from *The Cat in the Hat,* a children's book written by Dr. Seuss (née Theodor S. Geisel). Defendants used this image numerous times throughout the book and also copied Dr. Seuss' "whimsical poetic style." *Id.* at 1397–98. The Court rejected defendants' fair use defense on the grounds that they had appropriated Dr. Seuss' work, not to parody it, but rather to use it to satirize something entirely different—the O.J. Simpson trial. *Id.* at 1399–1401. The book did not hold Dr. Seuss' "style up to ridicule"; instead, it only copied elements of his *Cat in the Hat* books " 'to get attention' or maybe even 'to avoid the drudgery in working up something fresh.' " *Id.* at 1401.

This case differs significantly from *Dr. Seuss.* First, unlike the copyright dispute in *Dr. Seuss,* Mattel's trademark infringement case is based on defendant's use of the word "Barbie." *See also Rogers v. Grimaldi,* 875 F.2d 994, 998 (2d Cir.1989) ("Because overextension of Lanham Act restrictions in the area of titles [of artistic works] might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict."). Defendants do not use the image of the Barbie doll anywhere on their album, nor do the singers make themselves appear to look like the dolls Barbie and Ken, unlike the *Dr. Seuss* defendants' use of Geisel's images and writing style. Instead, they invoke the name of "Barbie," poking fun at *both* her and the plastic values she represents. Plaintiff's broad reading of *Dr. Seuss* would eviscerate the use of brand names as metaphors for the

values they have come to symbolize; only songs and books that poke fun at the product *and nothing else* would receive First Amendment protection under plaintiff's interpretation. This approach would conflict with binding precedent on the protection afforded to expressive works such as parodies. *See Acuff–Rose,* 510 U.S. at 581, 114 S.Ct. 1164 (observing that "parody often shades into satire when society is lampooned through its creative artifacts" and that individual parodies need to be assessed on a case-by-case basis); *Fisher,* 794 F.2d at 437–38. As the *New Kids* Court observed, "[m]uch useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademarks." 971 F.2d at 307; *see also Girl Scouts of U.S. v. Bantam Doubleday Dell Publishing Group,* 808 F.Supp. 1112, 1119 (S.D.N.Y.1992) ("To prevent filmmakers, novelists, painters, and political satirists from including trademarks in their works is to cordon off an important part of modern culture from public discourse."), *aff'd,* 996 F.2d 1477, 1478 (2d Cir.1993) (affirming "substantially for the reasons" given in the lower court's "careful opinion").

As the *Dr. Seuss* Court itself observed, "[p]arody is regarded as a form of social and literary criticism, having a socially significant value as free speech under the First Amendment." *Dr. Seuss,* 109 F.3d at 1400. Courts have observed that songs are also "indisputably works of artistic expression" deserving of First Amendment protections. *Rogers,* 875 F.2d at 997; *see also Fisher,* 794 F.2d 432. Because this Court finds that the song *Barbie Girl* is a parody, it will also consider defendants' First Amendment interests in commenting on a popular brand name when evaluating plaintiff's trademark infringement claims.

### D. INFRINGEMENT CLAIMS

Plaintiff argues that the song *Barbie Girl* infringes upon its federal trademark in the name "Barbie" and that the song title will likely confuse consumers into believing that the song is part of the Barbie product line. Defendants respond that plaintiff exag-

gerates the reach of its trademark and cannot silence song parodies that poke fun at its product simply because they use the word "Barbie" in their title or lyrics.

The Lanham Act provides that

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering in sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant....

15 U.S.C. § 1114(1)(a) (West 1997).

The Ninth Circuit has observed that the purpose of trademark has "remained constant and limited: Identification of the manufacturer or sponsor of a good or the provider of a service." *New Kids,* 971 F.2d at 305. Trademarks represent "a limited property right in a particular word, phrase, or symbol." *Id.* at 306. It does not allow trademark holders to censor or silence all discussion of their products that they find annoying or offensive. *Cf. id.* at 307 (discussing loss to social discourse if speakers cannot make reference to a product by using its trademark). Before applying trademark law to this case, however, the Court will consider whether the song's references to Mattel's doll fall outside the trademark context as a fair use of the term "Barbie."

### 1. The *New Kids* Standard

Generally, the Ninth Circuit applies an eight-factor "likelihood of confusion standard" to both common law and federal statutory trademark infringement. *See Dr. Seuss,* 109 F.3d at 1403–04; *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979); *but see Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.,* 886 F.2d 490, 495 n. 3 (2d Cir.1989) (noting that this multifactor test is "at best awkward in the context of parody, which must invoke the original and constitutes artistic expression"). However, in *New Kids on the Block,* the Ninth Circuit recognized that the "nominative use of a mark—where the only word

reasonably available to describe a particular thing is pressed into service—lies outside the strictures of trademark law." 971 F.2d at 308; *see also In re Dual–Deck Video Cassette Recorder Antitrust Lit.,* 11 F.3d 1460, 1467 (9th Cir.1993) (holding that VCR manufacturer's descriptive use of the term "VCR 2" was a fair use as a matter of law). The Ninth Circuit applies a fair use test, rather than the likelihood of confusion test, in cases "where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one[,][s]uch minimal use of a mark—where the only word reasonably available to describe a particular thing is pressed in service—lies outside the strictures of trademark law." 971 F.2d at 308.

The *New Kids* case involved two newspapers that conducted polls by phone about readers' reactions to the musical group New Kids on the Block. The papers set up "900" numbers and charged their readers anywhere from 50 to 95 cents per minute to respond to the questions in the poll. The band brought a trademark infringement suit against the newspapers. *Id.* at 304–05.

*New Kids* recognized that the newspaper's use of the name constituted a "fair use" because it was used to describe the plaintiff's product (i.e. the band) rather than its own (i.e. its reader polls). *Id.* at 308. The Court reached this result even though the band had their own phone lines for their fans to call. *Id.* at 309. The Court specifically noted that the case differed from "the classic fair use case where the defendant had used the plaintiff's mark to describe the defendant's own product." *Id.* at 308.

Here, defendants' use of the term "Barbie" refers to the doll and the values it has come to represent. By describing the doll's "life in plastic" and the various ways young consumers play with the doll ("you can brush my hair, undress me everywhere"), the band Aqua is not speaking specifically about its own product, but rather is commenting on and parodying Mattel's. Although the title of the song, *Barbie Girl,* also refers to the product sold by defendants, the use of the term "Barbie" in this context describes a type of girl—one who is vacuous, unreal, and

plastic. As noted earlier, the term "Barbie" has acquired a variety of cultural associations, not all of which are positive. The use of the term plays directly upon these associations. *Cf. Acuff-Rose,* 510 U.S. at 580, 114 S.Ct. 1164 ("[T]he heart of any parodists claim to quote from existing material is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's work").

The *New Kids* Court set out a three-part test for a "commercial user ... [to be] entitled to a nominative fair use defense":

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the use must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Id.* at 308. Defendants meet each of these three elements.

First, defendants cannot effectively parody or comment on the Barbie doll without mentioning her by name.[27] *See id.* at 306 (observing that "it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, ... or any other purpose without using the mark"); *see also* Rasted Decl. at ¶ 11 (noting that the songwriter's intent was "to compose a humorous song about the 'Barbie fantasy world.' "); Defs.' Mot. at 24 ("A principal underlying message of *Barbie Girl*—having to do with the vacuous, 'plastic,' and frivolous lifestyle suggested by the doll and all of her possessions—simply could not be made without evoking the Barbie doll iconography.").

Second, the song's use of the term "Barbie" is for purposes of parody. (*See* Rasted Decl. at ¶¶ 10–14); *see also Fisher,* 794 F.2d at 435 (noting that Congress has recognized

parody as a potential "fair use" activity in the context of copyright law). Referring to Barbie as a "bimbo" living in a plastic world, the song critiques the party-girl image that Barbie has acquired in some quarters. (*See* Lanham Decl., ¶ 35). The singers do not adopt the image or likeness of the dolls, either on any of the CDs or in the video. Indeed, the singers (the dark-haired female lead, with a tattoo on her arm, and the bald male singer with blue markings on the sides of his head, *see* Pruetz Decl., Ex. E1), do not resemble the traditional images of Barbie with blond hair or Ken with a full head of hair. Nor does MCA adopt the Barbie logo used by Mattel.

Further, the repeated use of the words "Barbie" and "Ken" are reasonably necessary for the purposes of parody. In the song, the singers adopt the identity of the dolls and sing to each other about their lives. Barbie refers to herself as a "blond bimbo girl in a fantasy word," who can be undressed, played with, and easily manipulated ("Make me walk, make me talk, do whatever you please"). Ken, in turn, urges Barbie to join him in partying. The lyrics poke fun at the dolls and their images through role-playing by the singers. (*See also* Pruetz Decl., Ex. F5, at 234). Because the singers adopt the identities of the dolls, singing lyrics that poke fun at them, the repeated use of the terms "Barbie" and "Ken" is consistent with the purposes of parody or social commentary.

Third, defendants' album identifies on the CD case that the song "is a social comment and was not created or approved by the makers of the doll," although the warning does not appear on all versions of the CD single. This warning suggests that defendants attempted to disassociate themselves from Mattel, although they should have included it on all of their CDs. Defendants at least attempted to show that their song is not

---

27. Plaintiff's assertion that Aqua should have referred to the song as "Party Girl" misses the point—the word "Barbie" conveys a whole set of meanings, including an image of a party girl. As noted earlier, even Mattel arguably has recognized, in a book put out under its copyright, that the doll has acquired multiple cultural meanings, not all of which are positive. (Rasted Decl, Ex. 15).

In addition, the *New Kids* court noted that "one might refer to 'the two-time world champions' or 'the professional basketball team from Chicago,' but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls." *Id.* at 306. Likewise, defendants correctly observe that it is far simpler for the singers to refer to "Barbie" rather than to sing "I'm an 11 ½ inch plastic doll...." (Def.'s Mot. at 25, n. 10).

endorsed by Mattel. *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1053 (2d. Cir.1983) ("Disclaimers are a favored way of alleviating consumer confusion as to source or sponsorship.").

Plaintiff claims that defendants cannot meet the third prong of the test because they allegedly suggested that the song was endorsed by Mattel. To support this point, plaintiff cites its own survey in which it asked participants the following question: "Do you think the company which owns the Barbie doll brand gave its permission to use the Barbie name on the music CD package?" (Cogan Decl, Ex. C, at 21). According to plaintiff's calculations, 39% of participants answered yes, 51% answered no, and 10% were uncertain.[28] (*Id.*). Plaintiff asserts that these numbers show actual confusion among consumers, although its own calculations show that only 4% of respondents thought that Mattel or Barbie was the company that "puts out the music video and CD," when asked an earlier, more neutral question (*Id.* at 20).

Despite plaintiff's assertions regarding actual confusion, however, the *New Kids* fair use test is not a likelihood of confusion standard. The focus lies, instead, on whether defendants took actions to "capitalize on consumer confusion or to appropriate the cachet of one product for a different one." *New Kids*, 971 F.2d at 308. In addition to the warning on the CD, defendants took other actions to avoid confusion. For example, in a marketing plan for the album dated July 31, 1997, defendants noted that "obvious promo items that will give the project an added novelty feel (Barbie dolls, etc.) won't be uti-lized to keep the campaign focused to a broad demo, *as well as avoid any direct connection or conflict to Mattel or the Barbie doll.*" (Pruetz Decl., Ex. X, at 402) (emphasis added). Further, in a June 26, 1997, memo by Universal regarding the plan to promote Aqua, defendants wrote that

> [a] decision was taken that there should be no (or if essential, very limited) tie-ins with Mattel (manufacturers of the barbie doll). The feeling was that we did not need this tool to market our brand, "Aqua." The band has a strong image and we did not want the consumer to get confused thinking our track "Barbie Girl" was about the doll or associated products which could label this track and the band as a one off novelty record.... This is not a quirky, one off single, Aqua is a real band, and "Aquarium" is a great pop album, full of follow up singles, with a huge sales potential.

(*Id.*, Ex. V, at 397). It appears that defendants wished to avoid creating consumer confusion and took steps to decrease the chance that consumers would mistakenly assume that Mattel endorsed or was connected with this single. Defendants did not "suggest sponsorship or endorsement by the trademark holder."[29] *New Kids*, 971 F.2d at 308.

For the foregoing reasons, the Court finds that the *New Kids on the Block* factors apply and that defendants' use of the term "Barbie" is outside the trademark context.

### 2. Likelihood of Confusion Factors

 As an alternative holding, the Court will also consider whether summary judgment is appropriate under the more tra-

---

**28.** When asked the more neutral question, "who or what company, if any, do you think is connected with or gave permission for the music video and CD (music CD) you just saw," 20% responded "Universal/MCA/Aqua/Barbie Girl" and 6% responded a "Music/Entertainment Company." Only 17% responded "Mattel or Barbie;" one *percent responded a toy company.* Forty-seven percent did not know what company was connected with the song. (Cogan Decl., Ex. C, at 20).

**29.** Plaintiff points to a quote by Carmen Cacciatore, senior director of A & R for MCA Records, to support its claim that defendants attempted to expropriate plaintiff's trademark. Cacciatore reportedly said that MCA "went with what we knew would be the impact cut [by releasing *Barbie Girl* as the first single in the United States], taking a part of American culture with Barbie. By packaging the great connection with a great band, we now have this kind of phenomenon happening." (Pruetz Decl, Ex. F1, at 222). The "connection" being packaged, however, is the cultural associations that the doll has and that the band was spoofing. As noted early, Barbie is a part of American culture and is subject to criticism and commentary like all cultural icons.

ditional likelihood of confusion test.[30] These factors, known as the *Sleekcraft* test, including the following:

> (1) the strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; (8) likelihood of expansion of the product lines

*Dr. Seuss,* 109 F.3d at 1404 (citing *Sleekcraft,* 599 F.2d at 348–49). These factors are not exhaustive, and the court may take into account "[o]ther variables ... depending on the particular facts presented.'" *Id.; see also Eclipse Assoc. v. Data General Corp.,* 894 F.2d 1114, 1118 (9th Cir.1990) (observing that the various formulations of the likelihood of confusion test "were not meant to be requirements or hoops that a district court need jump through to make the determination."). In addition, the Ninth Circuit has recognized that a court can determine as a matter of law that a plaintiff cannot demonstrate a "likelihood of confusion." *Murray v. Cable National Broadcasting Co.,* 86 F.3d 858, 860 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 689, 136 L.Ed.2d 613 (1997); *Newton v. Thomason,* 22 F.3d 1455, 1462 (9th Cir.1994); *Chesebrough–Pond's, Inc. v. Faberge, Inc.,* 666 F.2d 393, 399 (9th Cir.), *cert. denied,* 459 U.S. 967, 103 S.Ct. 294, 74 L.Ed.2d 277 (1982); *Toho Co. v. Sears Roebuck & Co.,* 645 F.2d 788, 790–91 (9th Cir. 1981).

An additional factor that this Court will consider is the First Amendment interests at stake in this case. *See Cliffs Notes,* 886 F.2d at 494 ("[I]n deciding the reach of the Lanham Act in any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion.").[31] Although the First Amendment does not prevent trademark law from applying to artistic works, courts must be careful not to trammel on free speech values in protecting trademarks. Indeed, the Ninth Circuit has explicitly warned that plaintiffs

---

**30.** Plaintiff's state claims for trademark infringement, unfair competition, and passing-off are also governed by the likelihood of confusion test. *See Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1178 (9th Cir.1988) (observing that "[t]he ultimate test for unfair competition is exactly the same as for trademark infringement"); *Fisher,* 794 F.2d at 440 ("Under California law, a plaintiff claiming unfair competition must 'prove a likelihood of confusion by purchasers as to source.' "); *Toho Co. v. Sears Roebuck & Co.,* 645 F.2d 788, 794 (9th Cir.1981) (noting that passing off and misappropriation are different branches of unfair competition).

In addition, plaintiff's claim of false designation of origin under 15 U.S.C. § 1125(a) is governed by the likelihood of confusion test. *Murray v. Cable National Broadcasting Co.,* 86 F.3d 858, 860 (9th Cir.1996).

As to plaintiff's claim for wrongful use of a registered mark under Cal.Busi. & Prof.Code § 14335, neither side point to a test other than likelihood of confusion to apply to this claim. The law itself provides that "[a]ny person who uses or unlawfully infringes upon a [registered] mark[,] ... other than in an otherwise noninfringing manner, ... shall be subject to an injunction against the use by the owner of the mark." Cal.Bus. & Prof.Code § 14335(a). As the likelihood of confusion test is generally used to determine whether a use is noninfringing, the Court will apply the same test for § 14335(a).

**31.** *See also Dr. Seuss,* 109 F.3d at 1400; *Anheuser–Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 775 (8th Cir.1994) ("Parody does implicate the First Amendment's protection of artistic expression."); *Twin Peaks Productions v. Publications Intern.,* 996 F.2d 1366, 1379 (2d Cir.1993); *New Kids on the Block,* 971 F.2d at 307; *Rogers,* 875 F.2d at 998; *L.L. Bean,* 811 F.2d at 34; *Fisher,* 794 F.2d at 437–38.

The Second Circuit has observed that the possibility of confusion over two products must be "particularly compelling" to outweigh First Amendment interests raised when titles invoke popular figures to communicate a particular message. *Twin Peaks Productions,* 996 F.2d at 1379. The Ninth Circuit has not specifically adopted the "particularly compelling" language used by the Second Circuit, although a California district court has applied this test. *See No Fear, Inc. v. Imagine Films, Inc.,* 930 F.Supp. 1381, 1384 (C.D.Cal.1995).

As that court observed, "the Ninth Circuit has not yet addressed the confluence of First Amendment concerns and the Lanham Act." *Id.* at 1382 n. 1. Although the subsequent *Dr. Seuss* opinion discusses the importance of parody under the First Amendment, the Ninth Circuit has not dealt directly with whether the likelihood of confusion factors must be particularly compelling to outweigh First Amendment interests. (As seen below, plaintiff's incorrectly assumes that *Dr. Seuss* stripped trademark defendants of any First Amendment protection).

cannot "use the trademark laws ... to censor all parodies or satires which use their name." *New Kids,* 971 F.2d at 309; *see also Rogers,* 875 F.2d at 998 (noting that "[b]ecause overextension of Lanham Act restrictions in the area of titles [of artistic works] might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict"); *see also Girl Scouts,* 808 F.Supp. at 1118 ("The owner of a trademark does not possess a property right that is superior to the First Amendment right accorded to artistic expression.").

Plaintiff asserts, however, that defendants have no First Amendment defense against the Lanham Act by citing the Ninth Circuit's opinion in *Dr. Seuss.* In that case, the Court observed that "the cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution" and that the claim of parody can provide "no defense 'where the purpose of the similarity is to capitalize on a famous mark's popularity for the defendants' own commercial use." 109 F.3d at 1405–06 (internal citations omitted). The Court added that "[i]n a traditional trademark infringement suit founded on likelihood of confusion rationale, the claim of parody is not really a separate 'defense' as such, but merely a way of phrasing the traditional response that customers are not likely to be confused as to the source, sponsorship, or approval." *Id.* at 1405. Indeed, as the Second Circuit has noted, a successful parody "depends on lack of confusion to make its point." *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 504 (2d Cir. 1996).

As noted earlier, however, *Dr. Seuss* involved an entirely different set of facts, in which defendant copied the images and writing style of another book to tell the story of the O.J. Simpson trial. *Id.* at 1397–98. Here, defendants have used the name "Barbie" to poke fun at a popular product. *Dr.*

*Seuss* itself recognized the protection the First Amendment provides to works of parody, and it did not hold that all claims of "parody" as a defense are frivolous, just those that "solely capitalize[d]" on another's fame to satirize something completely different. 109 F.3d at 1400.

Even if Aqua knew that parodying a popular product would attract favorable attention, this knowledge alone cannot erase their First Amendment interests in commenting on Barbie: if it did, then no unknown group could criticize popular products because the accusation of trying to gain attention would always exist. The First Amendment's protections must apply even to those whose parodies target the strong, popular, or well-established. Defendants parody Barbie specifically and do not, like the *Dr. Seuss* defendants, merely use Barbie as a vehicle to satirize something completely different.[32] For these reasons, the Court will consider defendants' First Amendment interests after considering the eight more traditional factors of the likelihood of confusion test.

### a. Strength of the Mark

Defendants concede that the Barbie mark is strong, at least at to dolls and doll-related products. Although "an undeniably strong mark" usually favors plaintiffs, it can also favor some defendants who poke fun at the mark because "a parody depends on a lack of confusion to make its point." *Hormel Foods,* 73 F.3d at 503. Here, the lyrics of the song refer to Barbie as a "blond bimbo." If Mattel is correct that its product has a "wholesome image [that] Mattel has conscientiously developed for its BARBIE products," (*see* Pl.'s Opp'n at 7), then consumers would be more likely to recognize *Barbie Girl* as a parody.

### b. Proximity or Relatedness of Goods [33]

■ In *Toho v. Sears, Roebuck,* the Ninth Circuit held that two product lines

**32.** To the extent the song also pokes fun at individuals who are similar to this plastic doll (i.e. Barbie Girls), *Dr. Seuss* does not stand for the proposition that a parody can only target one object at a time. As a cultural icon, the word "Barbie" invokes not only images of the doll itself but also cultural associations (e.g. the doll's frivolous or unreal nature) that might apply to

real people, as well. *See also Acuff-Rose,* 510 U.S. at 581, 114 S.Ct. 1164.

**33.** In *Toho,* the Ninth Circuit refers to the second prong of the *Sleekcraft* test as "relatedness of the goods." 645 F.2d at 790. In *Dr. Seuss,* the Court refers to this prong as "proximity of the goods." 109 F.3d at 1404.

were "unrelated as a matter or law." 645 F.2d at 790. In that case, defendant sold under the name "Bagzilla" garbage bags that included a cartoon reptile on their packaging and carried the legend "Monstrously Strong Bags." Toho, a Japanese company that owned the name and image of the movie monster Godzilla, sued for false designation of origin. The Court applied the *Sleekcraft* factors and observed that the products were unrelated as a matter of law: it noted that "Sears sells garbage bags. Toho produces or sponsors only literary works and toys." *Id.; see also Sleekcraft*, 599 F.2d at 348 ("If the goods are totally unrelated, there can be no infringement because confusion is unlikely"); *Mejia & Assoc. v. IBM Corp.*, 920 F.Supp. 540, 547–48 (S.D.N.Y.1996) (noting that "[r]elevant considerations [for the proximity of goods factor] include the extent to which the goods or services fall within the same class or are used together, as well as any differences in content, purpose, geographic distribution, market position, and audience appeal").

In this case, defendants assert that Mattel's products (i.e.toys) and its own products (i.e.music) are unrelated as a matter of law. Defendant note that "[t]hey sell musical albums, cassettes, CDs, and other types of 'stand alone' forms of pre-recorded music that are played on the radio, telecast on MTV, sold in record stores, and tracked on the *Billboard* charts. Mattel simply *does not do this* . . . ." (Defs.' Reply at 8). Mattel, however, claims that it "licenses the same types of music products under the BARBIE mark as the defendants' BARBIE GIRL products: compact discs, audio cassettes, video cassettes and CD–ROMs." [34] (Pl.'s Opp'n at 16).

Several high-level employees at Mattel admitted in their depositions that they were unaware of any stand-alone CD, audio cassette or vinyl record of prerecorded music that was currently being sold by Mattel (other than music sold with a toy or as part of computer software or videos). (*See* McKenzie Dep. at 292–294 (executive vice president and general manager of Barbie worldwide); Haddad Dep. at 116–17 (general manager of Mattel Media); Fontinella at 44–45 (Senior Vice President of worldwide licensing and new ventures)). None of plaintiff's trademark registrations listed in its complaint (which includes dolls, books, purses, watches, bubble bath, and clothing) applies to records, CDs, or cassettes. [35] (*See* Second Am.Compl., Ex. 1–27).

Plaintiff alleges, however, that "Mattel has produced and licensed numerous music products," including two vinyl records ("Barbie Sings" and "Barbie and the Beat"), music videocassettes sold with "Dance! Workout with Barbie" and "35th Birthday Barbie," an audiocassette and CD version of "Barbie: The Look," a musical cassette tape, "Barbie Country Music Dancing With Me," and "at least eight music CD–ROMs." [36] Several of

---

34. Plaintiff presents no evidence, however, the MCA sells *Barbie Girl* videocassettes.

35. In a later filing, Mattel lists its worldwide trademark status report on Barbie, listing "hundreds of registrations and pending registrations for Barbie trademarks." (Pruetz Decl., at ¶ 3; Ex. B, at 163–183). In the twenty pages listing registrations in the United States, Mattel lists as "pending" a large group of products including "calculators, disposable cameras, eyeglass cases, . . . CD–ROMs, software, programs, tapes and discs, . . . musical, audio, and video sound recordings featuring games and storytelling. . . ." (*Id.*, Ex. B, at 169, 177). According to the list, the filing date for these pending registration was on October 8, 1997, after the present law suit began on September 11, 1997.

A review of this list indicates that no registered products appear to be the type of independently sold, prerecorded CDs or cassettes that defendants sell.

36. Mattel adds that in 1998 it plans to release "a product group which will feature a music cassette" called Barbie and the Glow Girls and that it is currently negotiating "a large-scale music deal with a competitor of MCA for a series of stand-alone music products, including singles, albums, cassettes and CDs." (Pl.'s Opp'n at 5). After defendants filed their reply, plaintiff filed a supplemental declaration stating that plaintiff had finalized a record deal with Sony Music. (*See* Pruetz Supp.Decl. at ¶ 2). According to an accompanying news report attached to plaintiff's declaration, real singers will adopt the character names of Barbie and several related dolls and the company will sell a full-length CD, to be sold separately by the children's music division of Sony Records. (*Id.*, Ex. A).

These products are not relevant to the current analysis, however, because they are not presently before consumers, nor is there evidence that consumers were aware of them at the time the

these products, however, are simply toys with accompanying music. (McKenzie Dep. at 190; McKenzie Decl. ¶¶ 11–12, Ex. D). In addition, Mattel provides no indication that these products are still being marketed: for example, the vinyl records are copyrighted in 1961. (*Id.* at Ex. F). In an earlier declaration, plaintiff attempted to describe such toy products as a miniature concert stage and music stores as examples of its music products. (*Id.* at ¶ 12). Mattel's products (including its purported music products) are unrelated to defendants' *Barbie Girl* CDs as a matter of law, with the exception of one Barbie Girl CD–ROM.

Defendants' CD–ROM, which contains a version of the video for *Barbie Girl,* is the only example of defendants' products that is the same type of product as that sold by Mattel. Even here, however, significant differences exist between the products. Plaintiffs so-called "musical" CD–ROM products include "Barbie Magic Hair Styles" and "Barbie Ocean Discovery." A consumer purchasing plaintiff's CD–ROM products, however, would not believe that they were buying music or a music video instead of a computer program. *See* Haddad Dep. at 50–51 (discussing Barbie Magic Hair Styler as allowing a child to do "virtual hair styling on the computer").[37] In contrast, the *Barbie Girl* CD–ROM only contains the video of the song and remixes of the single.[38]

### c. Similarity of the Marks

■ In assessing similarity, courts are to look at "the marks and names in their entirety and as they appear in the marketplace." *Nutri/System, Inc. v. Con–Stan Industries, Inc.,* 809 F.2d 601, 605–06 (9th Cir.1987) (quoting *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 444 (9th Cir.1980)); *see also Gallo,* 967 F.2d at 1291. "[M]arks are not 'similar' for purposes of assessing likelihood of confusion simply because they contain an identical or nearly identical word."[39] *Mejia,* 920 F.Supp. at 547.

*Barbie Girl* song first appeared in the U.S. market. *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 582 (2d Cir.1991).

37. To the extent Mattel's CD–ROM products and the *Barbie Girl* CD–ROM are related, Mattel has presented no evidence that the *Barbie Girl* CD–ROM is sold in United States stores along with the Barbie CD–ROM products. (*See* Grant Decl.). Indeed, the copy of the CD–ROM introduced into evidence by plaintiff was imported from England through Internet websites. (Samuels Supp. Decl., ¶ 10, Ex. I; *see also id.,* Ex. J–T). Plaintiff does not present any evidence that any of its music-related products are sold through this same website.

38. The Ninth Circuit's recent decision in *Dreamwerks* is distinguishable. In that case, the Court reversed a summary judgment ruling for a plaintiff partly on the grounds that the goods were not unrelated as a matter of law. 142 F.3d 1127, 1130 (9th Cir.1998). A relatively unknown company called Dreamwerks organized conventions for the fans of the Star Trek television and movie series. Dreamwerks sued Dream Works SKG, a new entertainment company, for trademark infringement.

The Ninth Circuit reversed the lower court on the grounds that the products of the two companies (movies and sci-fi merchandise/collectibles) "are now as complementary as baseball and hot dogs." *Id.* at 1130. The Court observed that consumers might mistakenly assume that an entertainment company like Dream Works had entered the "sci-fi merchandising business," given their ties to other entertainment related venues or products, such as amusement parks, computer games, and toys. In short, the fact that "Dreamwerks has carved out a narrow niche in the entertainment place, while Dream Works controls a much broader segment," did not mean the products sold by the companies was unrelated as a matter of law. *Id.* at 1130.

This case, however, is not a dispute over the use of the names of two different corporations selling goods in the same general product area: it is about a musical band who made references in a song to a trademark with strong cultural associations. DreamWorks and Dreamwerks were two businesses working in potentially overlapping segments of the entertainment industry; in this case, Mattel's Barbie is associated with dolls while *Barbie Girl* is simply a song about the doll. Despite its forays into clothing, bubble bath, and other non-toy-related products, Mattel presents no evidence that its Barbie line of products is associated with music in the public eye or that the public realized Mattel intended to enter the music scene at the time this lawsuit was filed.

39. Although both the name of the doll and the name of the song share the dominant term "Barbie," as explained earlier the use of "Barbie" in this context is for purposes of parody. *Cf. Century 21,* 846 F.2d at 1179. Although both products share this word, they differ significantly in their appearance and in the context in which they are used. *Id.*

■ The marks on defendants' product are not similar to Mattel's, as they use different lettering, styles, and even colors. (*See* discussion of trade dress, below). Further, the packaging of Mattel's products generally includes either an image of the Barbie or Ken doll or in other cases is transparent, revealing the actual doll.[40] None of Aqua's packaging has an image of any doll on it, whether resembling Barbie or not. All of Aqua's music CDs have a picture on their covers of the four band members, none of whom resemble Barbie or Ken.[41]

In addition, defendant's eleven-song CD album is mostly blue and has in large, rounded-block letter, the word "Aqua" and in smaller print, "Aquarium." On the back of the album, eleven song titles are listed, all in small-size yellow lettering. *Barbie Girl* is listed as track number three and has an asterisk next to it. This symbol refers to another asterisk below, which is next to a sentence in yellow warning that "[t]he song 'Barbie Girl' is a social comment and was not created or approved by the makers of the doll." The back of the album also identifies MCA as the copyright holder. This album is quite dissimilar from the style of packaging used on any of plaintiff's products.

The trade dress on plaintiffs' CD single versions of the song also differ significantly from plaintiff's product.[42] All contain the word "Aqua" in big, blue letters on their front covers, as well as a picture of the band. The fact that the words "Barbie Girl" always appear next to the words "Aqua" on the packaging is significant in that it decreases the likelihood of consumer error and confusion. The context in which the marks appear is important. *See Hormel Foods*, 73 F.3d at 503, 504 (noting that a character named "Spa'am" was always associated with the words "Muppet Treasure Island," decreasing the likelihood that consumers would confuse the Muppets' wild board puppet with Hormel's meat product known as Spam).

The differences in packaging between Mattel and MCA's products set this case apart from the books at issue in *Dr. Seuss*. In that case, the offending book expropriated the image of a hat used in Dr. Seuss' books and placed in on the front and back cover of the product. *Dr. Seuss*, 109 F.3d at 1402. Here, however, the band does not use any images of the Barbie doll itself, and the name "Aqua" is always the largest lettering on the packaging.

### d. Actual Evidence of Confusion

Some consumer confusion is inevitable when a few people fail to realize that one product is parodying another. Indeed, "[b]efuddlement is part of the human condition. No matter how clear the markings, no matter how different the names, no matter how distinctive the bottles, some confusion is inevitable." *Reed–Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 912 (7th Cir.1996). The fact that a plaintiff can point to some evidence of confusion in the abstract does not automatically mean that such confusion affects actual purchasing decisions. *See Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991) ("[N]o evidence links the confusion evinced by the [400 misdirected] calls [received by plaintiff] to any potential or actual effect on consumers' purchasing decisions."). Nor does a showing of some actual confusion automatically create a triable issue of fact. *Universal Money Centers, Inc. v. AT&T*, 22 F.3d 1527, 1535 (10th Cir.), *cert. denied*, 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Universal City*, 746 F.2d at 118.

---

**40.** *See* Second Am.Compl., Ex. 29; McKenzie Decl. (Prel.Inj.Mot .), Ex. C–I, K–M, O; Grant Decl. (Prel.Inj.Mot.) Ex. D–G, L, P–R, V, W, BB, FF–II; Pruetz Decl. (Opp'n), Ex. A1; Grant Decl. (Opp'n), Ex. C–D, H, K–M, R–T, V, W, Z, AA, GG.

Plaintiff states that "numerous products" do not have the dolls image on them, but it only provides as an example a photograph of three unidentified products (with titles such as "Bill Blass Barbie" and "Waterlily Barbie; Inspired by the paintings of Claude Monet"), a party hat,
and a pink T-shirt. (Pruetz Decl., ¶ 2 & Ex. A1–A3). None of these products appear to be musical in nature.

**41.** *See* Second Am.Compl.Ex. 31, 33, 35, 37; Rasted Decl., Ex. 1–2; Grant Decl. (Prel.Inj.Mot.), Ex. B, C, F, G, J, Q, U, Y, FF.

**42.** The Court assumes, as plaintiff alleges, that these produces are being sold in the United States.

As noted earlier, only four percent of survey participants in the Cogan survey indicated that they believed that Mattel or Barbie was the company that "puts out the music video and CD (music CD)" that the participants had just seen. (Cogan Decl., Ex. C, at 19). Even when asked the compound and vague question of what company is "connected with or gave permission" for defendants' CD and video, only 17 percent answered Mattel or Barbie. (*Id.*). *Compare with Gallo,* 967 F.2d at 1292 (finding that 40% of nationwide participants believed plaintiff "put[ ] out" defendants' similarly named cheese product). The fact that participants associate or connect plaintiffs' product with defendants is not itself evidence of confusion. *Prudential Ins.,* 694 F.2d at 1156.

Plaintiff furthers points to "29 unsolicited e-mail [at the Barbie website] and at least 10 oral inquiries" as evidence of actual confusion. (Pruetz Decl., Ex. M). Although some of these e-mails inquire about obtaining the song, others simply repeat lyrics of the song, state that they "love" the song, or even explicitly recognize that the song was not approved by Mattel. (*Id.*). These responses are ambiguous, at best, as to whether the writers believe Mattel is responsible for the song. *Universal Money Centers,* 22 F.3d at 1535 ("De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding likelihood of confusion....").

### e. Marketing Channels Used

Plaintiff argues that its products are sold in the same stores as defendants' product and advertised through similar venues. Defendants, in turn, claim that their song is sold in record stores and in record departments and that their advertising channels differ.

Reviewing the evidence favoring the plaintiff, it does appear that plaintiffs' products are sold in some cases in the same stores as the *Barbie Girl* CD, although plaintiff has not shown that any of its products are sold in the music sections of these stores, where defendants' CDs are sold. *See Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 967 (2d Cir.1981) (considering as a factor against finding likelihood of confusion the fact that BRAVO's crackers were shelved in a store's "cookies and crackers" section, while BRAVOS chips were shelved with "salty, crunchy snacks"); *Sunenblick v. Harrell,* 895 F.Supp. 616, 629 (S.D.N.Y.1995) (finding no likelihood of confusion between jazz music and rap music both labeled "Uptown Records" and observing that "[a]lthough the products are sold in the same channels of trade, they are not sold side-by-side; rather, they are featured in different sections of the stores in which they are sold, according to genre and not by label name"), *aff'd,* 101 F.3d 684 (2d Cir.1996). *Cf. Levi Strauss Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1359 (9th Cir.1985) ("A buyer cannot ... be confused unless he is looking for a label in his recognizes and picks up another in his confusion").

As evidence that the goods are sold in the same sections of stores, plaintiff provides the declaration of a paralegal employed by the law firm of plaintiff's counsel. In his declaration, Vincent Grant states that in his trips to various stores in Southern California, he sometimes encountered Mattel products being sold within five to ten feet of the *Barbie Girl* CD.[43] The products he compares, however, are unrelated. *See Toho,* 645 F.2d at 790. For example, he claims that at a Borders Book Music & Cafe store, he found defendants' product "approximately five feet away" from plaintiff's. (Grant Decl. ¶ 8). However, defendants' product is a musical CD located among other CDs; plaintiff's product is a book on collecting Barbie dolls. (Grant Decl., Ex. J–K). At the other stores, the only Barbie products Grant finds are computer CD–ROMs, toy products, and videos. Plaintiff does not show a single instance in which its products are sold among the other music CDs and cassettes at these mega-stores.[44] *See Vitarroz Corp.,* 644 F.2d

---

43. In his deposition, Grant admitted that he visited fourteen stores, eight of which did not carry both *Barbie Girl* and Mattel's products. None of these stores carried the *Barbie Girl* single. (Grant Dep., at 37, 39–40).

44. Grant states that, at in the "Kids Music" section at the store Best Buy, Barbie products are sold in the "Kids Music" section. (Grant Decl., at ¶ 14). A review of the accompanying photograph at Exhibit T show a sign that says "Kids Music." Underneath the sign are a large display

at 967 (observing that "modern marketing methods tend to unify widely different types of products in the same retail outlets or distribution networks").

As to advertising, Mattel asserts that both parties "use the same media and target the same class of consumers. Defendants and Mattel both advertise their products through print, radio, television and the Internet." (Pl.'s Opp'n at 22). For example, plaintiff claims that both parties advertise on Top 40 radio. However, plaintiff recognizes that its product is promoted through advertisements while defendants' product is promoted through "air play." (*Id.*). The distinction only highlights how the products are unrelated: defendants' *Barbie Girl* is a song played on the radio and television with other songs. Plaintiff's products, however, are not music or songs but primarily dolls, clothing, and assorted other products. Indeed, defendants' product is apparently marketed *as a musical product,* and plaintiff shows no evidence that its products are marketed in a similar manner.[45] (*See, e.g.,* Pruetz Decl., Ex. R (displaying Target mega-store advertisement listing *Barbie Girl* product among other advertisements for other music CDs)). Even assuming that plaintiff's evidence supports its assertion that the parties' products are marketed in the same venues (television programs, etc.), the evidence shows that defendants market their product as a standalone musical CD product. Plaintiff presents

no evidence that it markets its products as music.

### f. Degree of Care of Purchasers

As to the consumers each side targets, plaintiff claims that both parties target young girls. (Pl.'s Opp'n at 23). However, its earlier papers provide contradictory information about whom its primary purchasers are. *See* Pl.'s Mot. for Prel.Inj. at 19 (identifying "typical buyer" as "young, unsophisticated person[s]"); Anson Decl. at 2 ("More than one billion BARBIE line dolls have sold worldwide, principally to girls aged 3 to 11."); Pl.'s Reply, Prel.Inj., at 16 (identifying primary purchasers as adults who buy toys for their children or collectibles for themselves); *see also* McKenzie Dep. at 79 ("The Barbie brand of products is targeted to people aged zero to 100 plus" and that its "music-related products" are targeted to all ages).

Defendants claim that they target teenagers and adults, while Mattel's products are targeted at young girls ranging from 2 or 3 to 10 or 11 years old. *See* Defs.' Mot. at 20; Luther Dep. at 116 (Mattel senior vice president for marketing research worldwide) (agreeing that its target market was girls 5 to 10); Pl's Opp'n at 23 (referring to "Mattel's young female market").[46]

According to market research based on approximately 20,000 bounce back cards filled out by consumers who purchased Aqua products, 66% of "Aqua fans" are female and 65% of the fans were under the age of 18.

---

of "Flower Fun Barbie," a doll, and the "Barbie Photo Fun Set," which appears to include a small pink camera in packaging with a large photo of the doll. Neither of these products are musical, despite their location, and this exhibit does not show that CDs are sold in this department. Indeed, the *Barbie Girl* CD at Best Buy is sold with other CD musical products. (*Id.,* Ex. Q, at 29).

At Costco, Barbie computer software, in a heap of boxes on a table, are apparently displayed in the same long row as the *Barbie Girl* CD. (*Id.,* Ex. C). It does not appear from this photo that Costco is organized into departments in the same manner as most other stores. Even at this store, however, Aqua's album is sold among other CDs, including music by Whitney Houston, Marvin Gaye, and Amy Grant; Barbie's "Ocean Discovery" CD–ROM is sold with other computer products. (*Id.,* Ex. B–C).

**45.** Plaintiff also claims that defendants advertised their product in an independent magazine

devoted to Barbie doll collectors. (Pruetz Decl., Ex. O). A review of *Miller'$ Market Report,* however, reveals that the magazine did a *story,* on the song *Barbie Girl,* in which it clearly identifies Aqua as the band releasing the song and which thanks MCA Records "for providing *Miller'$* with promotion materials on AQUA and *Barbie Girl.*" (*Id.* at 349, 350 (referring to a "story" on the *Barbie Girl* song inside the magazine)).

**46.** *See also* Second Am.Compl. at ¶ 16 ("Every second, two BARBIE dolls are sold somewhere in the world and a typical American girl, aged 3–11, owns an average of eight BARBIE dolls"); *id.* at ¶ 17 ("Mattel also has marketed and sold and/or continues to market and sell an extensive line of BARBIE clothing and BARBIE clothing accessories, BARBIE musical product, BARBIE computer CD–ROM games, and other products *for young girls.*") (emphasis added).

(Healy Decl., Ex. B1, at 18). The data also is broken down along more specific age groups: 2% (under age 8), 38% (ages 8–13), 25% (ages 14–17), 15% (ages 18–21), 8% (ages 22–25) and 12% (ages 26 or higher). (*Id.* at 23). The average age was 16.9. (*Id.*). *See also* Pruetz Decl., Ex. H, at 240 (indicating that MCA contacted Hasbro "regarding male versus female voice-overs in commercials [regarding *Barbie Girl*] targeting female 'tweens,' defined at ages 9 to 14").

This data suggests some overlap in the demographic groups targeted by the two parties, although plaintiff does not provide clear data about the age of its *purchasers,* as opposed to consumers: for example, although a product may be targeted at young people, their parents may be the ones who actually purchase the dolls. Assuming that the bounce back cards were filled out by the purchasers of the CDs, it would appear that the average age of MCA's purchasers is 16.7. The relevance of the purchaser's identity is that they are they ones who may or may not be confused when confronting products with similar marks in the marketplace. The age of the average purchaser, whether a young child or an adult, can also affect the degree of care with which they purchase products.

The Court notes that, assuming the bounce back cards reflect purchasers of MCA's products, the average buyer of *Barbie Girl* is a teenager. In its papers, plaintiff has variously claimed that its primary purchasers are young children and adults—two groups distinct from teenagers.[47]

### g. Defendants' Intent

Defendants claim that they chose the name "Barbie" not to confuse the public but rather to parody the doll and make a comment on the values it represents. (Rasted Decl. ¶ 11) ("As I wrote the song, I knew that Barbie was a popular doll.... My intention was to use that imagery and evoke and comment on a 'Barbie World.' "). As to this element,

plaintiff need not show that defendants "intended to deceive consumers." *Gallo,* 967 F.2d at 1293. The weight of this factor is somewhat diminished in the context of parody, however, as all parodists of consumer products "intend to select" the products' mark to make their comments. *See also Cliffs Notes,* 886 F.2d at 494 (recognizing the need to balance First Amendment interests against likelihood of confusion, in part because it "allows greater latitude for works such as parodies, in which expression, and not commercial exploitation of another's trademark, is the primary intent"); *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 36 U.S.P.Q.2d 1812, 1818 (S.D.N.Y.1995) ("Henson acknowledges that it meant to invoke Hormel's trademark as a joke. This does not mean that Henson intended to cause confusion in the minds of consumers."), *aff'd,* 73 F.3d 497 (2d Cir.1996).

■ As noted earlier, plaintiff's "evidence" of intent include marketing documents by defendants that indicate a desire to *avoid* unnecessary connections to Mattel, specifically to "avoid any direct connection or conflict to Mattel." *See* Pruetz Decl., Ex. X, at 402. Plaintiff further alleges that the fact that the "bounce back" cards accompanying some of defendants' product are evidence of intent because the cards asked consumers if their hobbies included "collecting Barbies." *See* Healy Decl., Ex. B1, at 22. However, this answer was one of nine options presented to consumers.[48] Even if plaintiff's assertion that questions such as these show defendants were going after the same target audience (i.e. young girls), it does not directly show that defendants intended to confuse consumers regarding the parties' respective products. *See Newton,* 22 F.3d at 1463 (observing that plaintiff failed to show that defendants "intended to profit by *confusing consumers* ") (emphasis in original).

---

47. In its April 16th reply to its renewed motion for a preliminary injunction, plaintiff claims that "the only target audience ever considered when marketing the Aquarium album was girls, aged 9 to 14." (Pl's Reply, [Renewed] Mot. for Prel.Inj., at 19 (citing Romano Tr. at 20:14–22:6)). Even if plaintiff's assertion is correct, the identity of defendants' target audience is not the relevant

question: rather, the issue is who the purchasers of plaintiff's and defendants' respective products are.

48. Only 8% responded that collecting Barbie was one of the three hobbies that they enjoyed the most. (*Id.*).

### h. Expansion of Product Lines

Throughout this litigation, plaintiff refers to "Barbie Girl" products. However, the only product here is one song, *Barbie Girl,* which is sold in different forms and is performed by a new group that will be using totally different songs in future productions. (*See* Rasted Decl. at ¶ 17).

▆▆▆ Mattel claims that it is intending to expand its own line of products to include singles, albums, and CDs bearing the Barbie trademark. (Pl.'s Opp'n at 27 (citing McKenzie Decl., 276–277)). However, "the intent of the prior user [of a mark] to expand or its activities in preparation to do so, *unless known by prospective purchasers,* does not affect the likelihood of confusion." *Lang,* 949 F.2d at 582. Plaintiff provides no evidence that consumers were aware of these expansion plans at the time the Aqua CD was first released in the United States in 1997.

Likewise, plaintiff's assertions that defendants intended to market "a pink heart-shaped purse with BARBIE GIRL emblazoned on it" is irrelevant to the issue of expansion of products if consumers are unaware that the product was to be released. Plaintiff offers no evidence that consumers were aware of this potential product.

### i. Defendants' First Amendment Interests

As stated above, the Court finds that the *Barbie Girl* song is a parody. The Supreme Court has observed that

> parody has an obvious transformative value.... Like less ostensibly humorous forms of criticism, it can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one....

*Acuff–Rose,* 510 U.S. at 579, 114 S.Ct. 1164. The Court recognized the importance of these works in social discourse, even when some individuals fail to realize that they are parodies: "First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed." *Id.* at 583, 114 S.Ct. 1164 (quoting *Yankee Publishing, Inc. v. News America Publishing, Inc.,* 809 F.Supp. 267, 280

(S.D.N.Y.1992)). Nor does the fact that defendants targeted a popular trademark for parody leave their speech unprotected. *See New Kids,* 971 F.2d at 309.

As the Ninth Circuit has held, "the trademark laws do not give [plaintiffs] the right to channel their fans' enthusiasm (and dollars) only into items licensed or authorized by them." *New Kids,* 971 F.2d at 309. Defendants have produced a song that parodies plaintiffs' successful and well-known product. Censoring such parodies—even ones that become profitable themselves—raises serious dangers to the First Amendment.

In this case, the central issue is whether defendants can use the word "Barbie" in the title and lyrics of their song. Although some individuals inevitably will believe that titles and lyrics containing a celebrity or icon's name constitutes an endorsement, this risk "is outweighed by the danger of restricting artistic expression." *Rogers,* 875 F.2d at 1000. The First Amendment interests at stake outweigh the possibility that some people might not interpret the song's lighthearted lyrics as a comment or spoof of the popular Mattel product and might be confused as to whether Mattel put out or authorized the song *Barbie Girl.*

### E. MATTEL'S TRADE DRESS CLAIMS

▆▆▆ Besides its claims regarding the use of the name "Barbie," plaintiff also asserts that defendants have misappropriated plaintiffs trade dress, specifically the use of so-called Barbie "pink" in the *Barbie Girl* packaging and video.[49] (*See* Pl's Opp'n at 8; Pl.'s Mot. for Prelim.Inj. at 9). Trade dress is "the appearance of the product" and includes such features as "size, shape, color, color combinations, texture, or graphics." *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1506 (9th Cir.1987). Indeed, "[t]rade dress is the totality of elements in which a product or service is packaged or presented. These elements combine to create the whole visual image presented to customers...."

---

**49.** Plaintiff admitted in its earlier motion that it does not have a federal trademark registration for the "field of pink" it uses on its packaging. (Pl.'s Mot. for Prelim.Inj. at 5).

Stephen W. *Boney, Inc. v. Boney Services, Inc.*, 127 F.3d 821, 828 (9th Cir.1997).

■ To recover for trade dress infringement under 15 U.S.C. § 1125, plaintiff has the burden of showing that "its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers." *Rachel,* 831 F.2d at 1506 (quoting *Fuddruckers, Inc. v. Doc's B.R. Others,* 826 F.2d 837, 841 (9th Cir.1987)). "Under this analysis, trade dress may be protected if it is nonfunctional and has acquired secondary meaning and if its imitation creates a likelihood of consumer confusion." *Id.* (quoting *Fuddruckers,* 826 F.2d at 842).

■ Plaintiff cannot show that its use of the color pink has acquired secondary meaning. The color pink is used on many products associated with young girls, (*see* Folkes Decl. ¶ 15), and plaintiff provides no evidence as to how its pink differs from that used on these other products. *See Mana Products, Inc. v. Columbia Cosmetics, Mfg., Inc.,* 65 F.3d 1063, 1071 (2d Cir.1995) ("[T]here are countless numbers of cosmetic companies that sell black compacts"); *Brunswick Corp. v. British Seagull Ltd.,* 35 F.3d 1527 (Fed. Cir.1994) (holding that outboard motor company could not register the color black as its distinctive mark, partly on the grounds that other companies used black on their engines and that such use reflected a "competitive need"), *cert. denied,* 514 U.S. 1050, 115 S.Ct. 1426, 131 L.Ed.2d 309 (1995). Nor does plaintiff point to any evidence that its use of white lettering on a pink background is unique.

■ Plaintiff argues, however, that it is seeking registration for the word "Barbie" on a field of pink. (*See* Second Am.Compl., Ex. 28). In its application for trademark registration with the United States Patent and Trademark Office, plaintiff attaches an image of the word "Barbie" that has "stylized," slanted white lettering, apparently on a pink background.[50] (*Id.* at 67, 70). This application, however, specified that plaintiff has used this mark in connection with "dolls, doll clothing and doll accessories." (*Id.* at 66).

No mention is made of records, music, or CD products.

Plaintiff offers no evidence that pink and white lettering has acquired a "secondary meaning" with consumers. *Boney,* 127 F.3d at 828. Indeed, "a product feature whose only impact is decorative and aesthetic, with no source identifying role, cannot be given exclusive rights under trade dress law." *Id.* (quoting 1 McCarthy on Trademarks and Unfair Competition § 8.1). Although the word "Barbie" does denote the doll sold by Mattel, plaintiff has not demonstrated that the combination of pink and white are anything more than decorative colors used by Mattel and many other companies.

■ Even if plaintiff were correct that its pink and white trade dress were unique, significant differences exist between its packaging and that of the *Barbie Girl* song to prevent likelihood of confusion, at least as to trade dress. In comparing the packaging of the two products, this Court must consider the "totality of elements" involved in the packaging. *Boney,* 127 F.3d at 828.

Aqua's album, *Aquarium,* has a blue, watery background and contains yellow lettering for the eleven songs listed on the back. In big, rounded blue letters the word "Aqua" appears at the top of the CD. None of the song's lettering is larger than the other, and in fact, pink—BARBIE pink or otherwise—does not appear anywhere on the front or back of the CD case. (Pruetz Decl, Ex. E6). Likewise, the cassette version of the album does not contain any pink lettering. (*Id.* at Ex. E7).

Plaintiff's main complaint appears to be with the CD-single versions of the song. (*Id.* at E1–E3, E5, E9). However, a review of these packages reveals several significant differences. The cases for these CDs are mostly blue, with a picture of the band on all versions accept the CD–ROM. (*See id.*). The words "Barbie Girl" appear in pink block lettering. These letters have irregular borders and are shadowed in dark pink and outlined in both white and dark pink. At the top of every package of the CD are large, rounded blue letters spelling the word

---

**50.** The image attached to Exhibit 28 is in black and white.

"Aqua"; these letters have a white and black outline, with an eye appearing within the letter "Q." The use of pink on these albums differs significantly from the white on pink lettering that Mattel is attempting to claim as its trade dress. The curved, relatively thin lettering used by Mattel is quite distinct from pink block lettering used by *Barbie Girl.* As mentioned earlier, Mattel offers no evidence that its use of pink or even pink and white is distinct to its products alone.

Because Mattel cannot establish "the existence of an element essential" of claim (i.e. that the use of pink or even pink and white lettering has acquired a secondary meaning) and because it bears the burden of proving that element, summary judgment as to Mattel's trade dress claims is appropriate.[51] *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## F. MATTEL'S DILUTION CLAIMS

■ The Federal Trademark Dilution Act provides that

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.

15 U.S.C. § 1125(c)(1) (West 1997). The Act exempts from its reach the "[f]air use of a famous mark by another person in comparative advertising or promotion to identify the competing goods or services of the owner of the famous mark[;][n]oncommercial use of a mark[; and] [a]ll forms of news reporting and news commentary."[52] *Id.* at § 1125(c)(4). To prove dilution, a party need not show "the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception."[53] *Id.* at § 1127.

■ The Supreme Court has defined commercial speech in the First Amendment context as "speech which does no more than propose a commercial transaction."[54] *Virgi-*

**51.** As to the video, plaintiff claims that the set used mimics Barbie's accessories, including the pink Barbie Dream House. These images are not included on the packaging of any of the products sold to consumers.

As the band members look nothing like the dolls they spoof, using a set on the video to evoke the subject matter of the parody is appropriate under the circumstances. A parody, by definition, "needs to mimic an original to make its point." *Acuff–Rose,* 510 U.S. at 580, 114 S.Ct. 1164; *see also Fisher,* 794 F.2d at 435 n. 2 ("To 'conjure up' the original work in the audience's mind, the parodist must appropriate a substantial enough portion of it to evoke recognition."). Given that the pretend Barbie has a tattoo and dark hair, and the pretend Ken has a clean-shaven head, viewers are not likely to mistake these singers for Mattel's product, even though they are surrounded by a pink setting.

**52.** The Act also provides that a plaintiff is only entitled to injunctive relief unless the person accused of violating subsection (c) "willfully intended to trade on the owner's reputation or to cause dilution of the famous mark." *Id.* at § 1125(c)(2).

**53.** California's trademark dilution statute provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter ... shall be ground for injunctive relief, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." Cal.Bus. and Prof .Code § 14330 (West 1997). The Ninth Circuit has held that California's anti-dilution law "is designed to protect against the gradual 'whittling away' of a trademark's value." *Academy of Motion Picture, Arts & Sciences v. Creative House Promotions,* 944 F.2d 1446, 1457 (9th Cir.1991).

First Amendment considerations, however, apply to claims for dilution under California law. *New Kids on the Block v. News America Publishing, Inc.,* 745 F.Supp. 1540, 1542 n. 1 (C.D.Cal. 1990), *aff'd,* 971 F.2d 302 (9th Cir.1992).

**54.** Plaintiff places much significance on the fact that defendants attempted to market their song, through ads, videos, and promotional stickers. (*See* Pl.'s Opp'n at 30–31). The fact that defendants' product makes a profit or is successful, however, does not affect the protections afforded to it by the First Amendment. By plaintiff's reasoning, any book, movie, or song that incorporates a product name in its title would receive less protection the more money that it makes. *See Virginia State Bd.,* 425 U.S. at 761, 96 S.Ct. 1817.

Although the Ninth Circuit in *White v. Samsung Electronics* stated in dicta that "[t]he difference between a 'parody' and a 'knock-off' is the difference between fun and profit," that Court did not directly discuss the Supreme Court's holding that for-profit, noncommercial speech is

*nia State Bd.*, 425 U.S. at 762, 96 S.Ct. 1817; *see also Cardtoons*, 95 F.3d at 959 (noting that parody trading cards "are not transformed into commercial speech merely because they are sold for profit"). An accompanying House Report to the Federal Trademark Dilution Act provides that "[t]he bill will not prohibit or threaten 'noncommercial' expression, as the term has been defined by the courts. Nothing in this bill is intended to alter existing case law on the subject of what constitutes 'commercial' speech." H.R.Rep. 104–374. As parody is a form of noncommercial, protected speech, the Act does not affect the First Amendment protection accorded to it, a proposition recognized by several supporters of the legislation.[55] *See also L.L. Bean*, 811 F.2d 26 (applying First Amendment principles to protect parody against state anti-dilution claim).

Plaintiff contends that its famous mark is associated with wholesomeness and that defendants' song tarnishes that mark through its "sexual and denigrating lyrics." (Pl.'s Opp'n at 7). In its prior papers, plaintiff has characterized *Barbie Girl* as supporting "promiscuity, lewdness, and the stereotyping and denigration of young women." (Pl.'s Prel.Inj.Mot. at 25). However, plaintiff has not shown that its mark is associated exclusively with wholesomeness. Indeed, their product itself has been accused of promoting unrealistic, sexist stereotypes of what constitutes the "ideal woman." *See, e.g.*, Folkes Decl., Ex. 22 (noting that doll has a "party-girl" image with some members of the

public). In addition, a book copyrighted by Mattel about Barbie variously described her as a "buxom fashion queen," "a dream goddess," and "a sophisticated grown-up doll"; the book further acknowledged criticism of the doll for its unrealistic body proportions. (*See* Rasted Decl., Ex. 15).

Even if the song did tarnish or dilute the Barbie mark, defendants' speech falls within the "noncommercial use of a mark" exception to the federal statute. As noted earlier, the fact *Barbie Girl* is sold for money is not dispositive as to whether the use of the mark is commercial. *Virginia State Bd.* 425 U.S. at 761, 96 S.Ct. 1817; *cf. New Kids*, 971 F.2d at 309 (holding that "[w]here ... the use [of a mark] does not imply sponsorship or endorsement, the fact that it is carried on for profit and in competition with the trademark holder's business is beside the point" for purposes of trademark infringement).

In *L.L. Bean*, the court, in considering a state anti-dilution claim, found that the use of L.L. Bean's trademark in a monthly adult entertainment magazine was a noncommercial use because it was parodying an actual catalog produced by the plaintiff. 811 F.2d at 32. As the Court observed, the defendant had "not used Bean's mark to identify or market goods or services; it ... used the mark solely to identify Bean as the object of its parody." *Id.* at 33. Likewise, in this case, defendants' use of the term "Barbie" is for the purposes of parody, rather than to sell knock-off Barbie products.

---

protected under the First Amendment. *See* 971 F.2d 1395, 1401 (9th Cir.1992). In addition, White involved the use in an advertisement of a robot designed to resemble a real-life celebrity, raising the danger that viewers might see the advertisement (for electronics products) as endorsed by the celebrity. *Id.* This danger was compounded by the fact that ad was one in a series that used other celebrities to sell Samsung's products. *Id.* This case, however, involves a parody poking fun directly at Barbie, unlike the alleged parody in *White*, which was "subservient and only tangentially related to the ad's primary message: 'buy Samsung VCRs.' " *Id.* The Court further noted that, "the first amendment hurdle is not so high" in the case of commercial advertisements. *Id.* at 1401 n. 3.

Plaintiff further cites its Cogan survey to support its claim that the song has diluted its mark.

However, likelihood of confusion is not the test applicable here.

**55.** *See* 141 Cong.Rec. S19312 (1995) (Senator Leahy) (stating that "parody, satire, editorial, and other forms of expression will remain unaffected by this legislation"); 141 Cong.Rec. S19306, S19310 (Senator Hatch, introducing the bill) ("The bill will not prohibit or threaten noncommercial expression, such as parody, satire, editorial and other forms of expression that are not a part of a commercial transaction."); 141 Cong.Rec. H14317, H14318 (Representative Moorehead) ("The bill would not prohibit or threaten noncommercial expression, such as parody, satire, editorial, and other forms of expression that are not part of a commercial transaction.").

■ The *L.L. Bean* Court also rejected the argument that mere association of a trademark with "unwholesome or negative context" is enough to make a trademark dilution claim. *Id.* at 31; *see also New Kids,* 971 F.2d at 307 n. 5 (observing that "[a] trademark may even be used lawfully in a way that many people, including the trademark owner, may find offensive"). Although plaintiff characterizes the song as including sexual innuendo, such sexual but nonobscene speech is "entitled to no less protection than other forms of expression," no matter how coarse, vulgar, or distasteful it may be to some. *L.L. Bean,* 811 F.2d at 34 (quoting *Fantasy Book Shop, Inc. v. City of Boston,* 652 F.2d 1115, 1126 (1st Cir.1981)); *see also Fisher,* 794 F.2d at 437 (noting that a comic song about sniffing glue was "innocuous—silly perhaps, but surely not obscene or immoral," even though its parodied another, more famous tune).

In addition, applying the trademark dilution law to parodies such as the song *Barbie Girl* raises important First Amendment questions. As the L.L. Bean Court observed,

> The central role which trademarks occupy in public discourse (a role eagerly encour-

aged by trademark owners), makes them a natural target of parodists. Trademark parodies, even when offensive, do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark.... Denying parodists the opportunity to poke fun at symbols and names which have become woven into the fabric of our daily life, would constitute a serious curtailment of a protected form of expression.

*L.L. Bean,* 811 F.2d at 34. This Court must be wary of applying anti-dilution statutes to permit "a trademark owner to enjoin the use of his mark in a noncommercial context" simply because they find such parodies "negative or offensive." *Id.* at 33. "[A] corporation could shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct," with detrimental consequences to free speech in this society.[56] *Id.*

Because defendants' speech falls within the noncommercial use exception, this Court finds that summary judgment is appropriate as to plaintiff's trademark dilution claim.[57]

**56.** Plaintiff cites to the Eight Circuit's decision *Balducci Publications,* which rejected applying *L.L. Bean* to the facts before it. *Balducci,* however, is distinguishable from the present case. *Balducci* involved an ad parody that referred to "Michelob Oily," and incorporated the logo of Michelob Dry, a beer product. The parody "suggested that Anheuser's Busch products [such as Michelob] were contaminated with oil." 28 F.3d at 778. The Court found that "[t]his unsupported attack was not even remotely necessary to Balducci's goals of commenting on [a specific] oil spill [in a water supply source used by plaintiff] and water pollution generally." *Id.* In this case, using the term "Barbie" to poke fun at Barbie is necessary for the purposes of parody. In addition, the criticism of the doll as being vacuous or sexualized—a criticism that has been made before of the doll—does not raise the same concerns of harm to business reputation as accusing a food product of being contaminated with a dangerous substance.

Although *Balducci* observed that *L.L. Bean* conflicted with the holdings of a few district court cases such as *Pillsbury v. Milky Way Productions,* 215 U.S.P.Q. 124 (N.D.Ga.1981), this Court finds *L.L. Beans'* analysis persuasive.

**57.** Even if defendants' speech did not fall within an exception under the Act, plaintiff would po-

tentially be entitled only to injunctive relief, as it has not shown that defendants "willfully intended to trade on the owner's reputation or to cause dilution of the famous mark." 15 U.S.C. § 1125(c)(2). The evidence presented by plaintiff suggests that defendants refrained from some marketing strategies "to avoid any direct connection or conflict to Mattel or the Barbie Doll." (Pruetz Decl., Ex. X, at 402; *see also id.,* Ex. V, at 397). Plaintiff places much significance in the comments of a senior official at MCA who stated that the defendants released *Barbie Girl* as the first single in the United States because it "tak[es] a part of American culture with Barbie. By packaging the great connection with a great band, we now have this kind of phenomenon happening." (*Id.,* Ex. F1, at 222). Once again, plaintiff ignores that parody often relates to popular products or personalities in American culture—"the great connection" is between the band and the cultural images that surround Barbie. The fact that defendants intentionally target the doll for a light-hearted spoof does not undermine a court's finding that defendants did not act willfully in this context: in every case of parody, speakers intentionally target the object of their parody. *See Cliffs Notes,* 886 F.2d at 494.

### G. MATTEL'S MISAPPROPRIATION AND UNJUST ENRICHMENT CLAIMS

■ Plaintiff also brings claims against defendants under the theories of common law misappropriation (claim seven) and common law unjust enrichment (claim nine). In California, the "doctrine of misappropriation prohibits the substantial copying of another's commercial labors even when there is no likelihood of confusion." *Toho*, 645 F.2d at 794. In *Toho*, the Ninth Circuit explicitly stated that it knew of no case "extending the misappropriation theory to trademark infringement. We believe that California courts would refuse to make such an extension." *Id.*

■ As to unjust enrichment, defendant claims that this theory "has no support under California law and is just another attempt to sidestep the requirements of trademark law." (Def.'s Mot. at 31). Defendants, however, cite no case that directly holds that unjust enrichment theories cannot be applied in the trademark context.

Defendants cite *Lauriedale Assoc. v. Wilson*, which held that "restitution will be denied where application of the doctrine would involve a violation or frustration of the law or opposition to public policy." 7 Cal.App.4th 1439, 1449, 9 Cal.Rptr.2d 774 (1992). The Court specifically noted that the appellants in that case had mischaracterized their legal theory as "unjust enrichment," when in fact they were seeking restitution. *Id.* at 1448, 9 Cal.Rptr.2d 774. The Court described unjust enrichment as "the result of a failure to make restitution under circumstances where it is equitable to do so." *Id.*

Because defendants did not infringe or dilute plaintiff's trademark and because defendants have a strong interest First Amendment interest in parodying a popular brand name, this Court does not find that defendants are required under principles of equity to make restitution to plaintiff.

**58.** The foreign defendants include Universal Music International, a citizen of Great Britain; Universal Music A/S, a Denmark national; and MCA Music Scandinavia AB, a national of Sweden.

### H. PARIS CONVENTION

Plaintiff's fifth cause of action is for unfair competition under the Paris Convention. (Pl.'s Second Am.Compl. at 23). Mattel asserts that, under 15 U.S.C. § 1126(i), it is entitled to bring suit against the foreign defendants in this case and to invoke the remedies of the Lanham Act. (*Id.* at ¶ 72).

Section 1126 deals with international conventions for the protection of trademarks and commercial names. Subsection (i) provides that United States citizens "shall have the same benefits as are granted by this section to persons described in subsection (b) of this section." 15 U.S.C. § 1126(i) (1997). Subsection (b), in turn, provides that

> [a]ny person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, ... shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty, or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this chapter.

*Id.* at § 1126(b).

Defendants assert that no private cause of action exists under the Paris Convention. Plaintiff responds that the "substantive provisions of unfair competition treaties, like the Paris Convention, are applicable through the Lanham Act and create a federal cause of action for unfair competition in international disputes." (Pl.'s Opp'n at 33).

■ In this case, plaintiff is an American corporation suing both domestic and foreign defendants.[58] Plaintiff fails to demonstrate, however, that the Paris Convention creates a separate and distinct cause of action from those already available under the Lanham Act. In *Kemart Corp. v. Printing Arts Research Laboratories, Inc.*, the Ninth Circuit held that "the Paris Convention was not intended to define the substantive law in the

(Pl.'s 2d Am.Compl. at ¶ 69). In amending its complaint, plaintiff dismissed Locomotion Kofod Schiller Film A/S, another foreign defendant.

area of 'unfair competition' of the signatory countries, but rather to set out the broad basic principles under which the laws of said countries would operate." 269 F.2d 375, 389 (9th Cir.), *cert. denied,* 361 U.S. 893, 80 S.Ct. 197, 4 L.Ed.2d 151 (1959).

"The underlying purpose [of the Paris Convention] is that foreign nationals should be given the same treatment in each of the member countries as that country makes available to its own citizens." *Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 640–41 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). To that end, courts have recognized that, under the Paris convention, *foreign* plaintiffs can "assert a federal cause of action for acts of unfair competition which occurred in the United States." *See Maison Lazard Et Compagnie v. Manfra, Tordella & Brooks, Inc.,* 585 F.Supp. 1286, 1289 (S.D.N.Y.1984); *see also Majorica, S.A. v. Majorca Intern., Ltd.,* 687 F.Supp. 92, 96 (S.D.N.Y.1988) (holding that foreign plaintiff could "invoke the Paris Treaty together with the Lanham Act to assert a federal claim of unfair competition" but it could not require U.S. courts to apply the substantive law of foreign countries). *Cf. Toho Co.,* 645 F.2d at 792–93 (recognizing that a Japanese corporation was entitled to bring both state and federal unfair competition claims, through the Lanham Act and the Treaty of Friendship, Commerce and Navigation between the United States and Japan).

■ On the other hand, courts have also recognized that "the Paris Convention does *not* create 'private rights under American law for acts of unfair competition occurring in foreign countries.' " *Heerema Marine Contractors v. Santa Fe International Corp.,* 582 F.Supp. 445, 455 (C.D.Cal.1984) (quoting *Vanity Fair,* 234 F.2d at 640) (emphasis added). As the Second Circuit observed,

[t]he Convention is not premised upon the idea that the trade-mark and related laws of each member nation shall be given extraterritorial application, but on exactly the converse principle that each nation's law shall have only territorial application. Thus a foreign national of a member nation using his trade-mark in commerce in the United States is accorded extensive protection here against infringement and other types of unfair competition.... But that protection has its source in, and is subject to the limitations of, American law, not the law of the foreign national's own country. Likewise, the International Convention provides protection to a United States trade-mark owner such as plaintiff against unfair competition and trademark infringement in Canada—but only to the extent that Canadian law recognizes the treaty obligation as creating private rights or has made the Convention operative by implementing legislation.

*Vanity Fair,* 234 F.2d at 640–41. Thus, the Paris Convention does not create substantive law distinct from the trademark laws of individual nations.

■ In this case, plaintiff does not allege causes of action based on the law of England, Sweden, or Denmark (the nations where the foreign defendants are citizens). Even if it had, courts have held that "the trademark laws of a foreign country have no extraterritorial effect and cannot be asserted to support federal claims in a United States district court." *Majorica, S.A.,* 687 F.Supp. at 95. Plaintiff does not have a cause of action in this Court for actions taken by foreign defendants in foreign countries.

■ To the extent plaintiff is attempting to apply the Convention as to the foreign defendants' acts in *this country,* the Convention does not create a separate cause of action distinct from those already provided under federal law.[59] *See Kemart,* 269 F.2d

---

**59.** Plaintiff cites *General Motors Corp. v. Ignacio Lopez de Arriortua,* for the proposition that "[t]he Lanham Act incorporates the substantive provisions of the Paris Convention and thus creates a federal law of unfair competition applicable in international disputes." 948 F.Supp. 684, 690 n. 5 (E.D.Mich.1996). The Court reached this result by invoking *Toho* and *Maison Lazard.* Those

cases, however, involved foreign plaintiffs attempting to assert a federal cause of action of unfair competition for conduct that occurred in the United States. *Maison Lazard,* 585 F.Supp. at 1289; *Toho,* 645 F.2d at 793.

*General Motors* arguably went beyond those cases, by holding that an American plaintiff could invoke the substantive provisions of the

at 389. Defendants are therefore entitled to summary judgment as to plaintiff's fifth claim.[60]

## III. MATTEL'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIM

After the filing of this case by Mattel, there were a number of published accounts of the suit that quoted various employees of both MCA and Mattel. In numerous articles, a spokesperson for MCA noted that the album included a disclaimer saying that "the song *Barbie Girl* is a social commentary and was not created or approved by the makers of the doll." (Defs.' Ex. A1). A Mattel employee, Sean Fitzgerald ("Fitzgerald"), responded to that statement by noting "That's unacceptable. . . . It's akin to a bank robber handing a note of apology to a teller during a heist. Neither diminishes the severity of the crime, nor does it make it legal." (*Id.*).

MCA President Jay Boberg issued a press release where he stated that "We believe Mattel's claims are baseless. *Barbie Girl* is just a terrific pop song that's been embraced by the public." He also referred to the fact that there was a disclaimer on the album. (*Id.*, Ex. A2). Fitzgerald responded by noting that "even if we found the lyrics acceptable, we would be filing this suit because the song was published and distributed without our permission and certainly without our notification. They are referring to this song as upbeat and fun, and its really our belief that

unlawful exploitation of another company's property for one's own commercial gain is neither upbeat or fun. It's theft." (*Id.*).

MCA filed this counterclaim for defamation based on Fitzgerald's use of the words "bank robber," "heist," "crime," and "theft" in the context of the two statements made by him regarding Mattel's suit against MCA over the *Barbie Girl* song. Mattel now moves for summary judgement.

■■■ This Court has previously denied Mattel's motion for summary judgement. MCA argues that Mattel should not be allowed to make this motion for reconsideration because Local Rule 7.16 requires a showing of material changes in the facts or law. However, at the prior hearing, the Court stated that "when we get closer to trial, we'll see whether this claim is going to go forward or not." The Court also noted that Fitzgerald's deposition had not yet been taken. Since his state of mind is relevant to determining whether a claim for defamation exists, his deposition is important evidence. Therefore, the Court will reconsider its prior ruling.

### A. STANDARD FOR DEFAMATION

■■■ Under California law, "a publication must contain a false statement of fact to give rise to liability for defamation. Even if they are objectively unjustified or made in bad faith, publications which are statements

---

Paris Convention, through the Lanham Act. For support, it cites 15 U.S.C. § 1126(i), which grants to U.S. citizens the "same benefits" as described in subsection (b), which extends the benefits of U.S. trademark law to foreign nations whose home countries have a treaty with the United States "relating to trademarks." *See* § 1126(b), 1126(i). The Court asserted that subsection (i) would be superfluous if it only meant "national treatment"—i.e. that countries give the same treatment to the nationals of other countries as they give to their own citizens. 948 F.Supp. at 688–89. This Court, however, is bound by *Kemart's* holding that "the Paris Convention was not intended to define the substantive law in the area of 'unfair competition' of the signatory countries." *Kemart*, 269 F.2d at 389.

Further, although the Ninth Circuit in *Toho* held that the federal right created by 15 U.S.C. § 1126(h) on the Lanham Act was "coextensive with the substantive provisions of the treaty in-

volved," it made this observation in the context of the Treaty of Friendship, Commerce, and Navigation between the United States and Japan. *Toho*, 645 F.2d at 792. This treaty, in turn, required that "Japanese companies be treated as favorably as domestic companies." *Id.* at 793.

Plaintiff's citations to *Pagliero v. Wallace China Co.*, a Ninth Circuit decision decided prior to *Kemart*, are unavailing. Although the Court speculated that it "did not think that the rights created by § 44(h) go further than the treaties [such as the Paris Convention] in this respect," the Court specifically noted that "[w]e do not attempt here to lay down definitive limits to the rights created in the Lanham Act by adoption for the conventions." 198 F.2d 339, 342 (9th Cir. 1952).

60. The Court does not reach defendants' alternative argument that they did not willfully infringe plaintiff's trademark.

of opinion rather than fact cannot form the basis for a libel action." *Campanelli v. Regents of the Univ. of Cal.*, 44 Cal.App.4th 572, 577–78, 51 Cal.Rptr.2d 891 (1996) (internal citations omitted). "The critical determination of whether an allegedly defamatory statements constitutes fact or opinion is a question of law for the court. . . . If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury." *Id.* at 578, 51 Cal.Rptr.2d 891.

To determine the difference between opinion and fact, courts use a "totality of circumstances test," where the court puts itself "in the place of an average reader and decide[s] the natural and probable effect of the statement." *Id.* "Statements cautiously phrased in terms of apparency are more likely to be opinions." *Id.* When potentially defamatory statements are made in a context where the audience might expect the parties to persuade others to their positions by epitaphs, fiery rhetoric or hyperbole, then language that might otherwise be considered fact may well be statements of opinion. *See Baker v. Los Angeles Herald Examiner*, 42 Cal.3d 254, 228 Cal.Rptr. 206, 721 P.2d 87 (1986); *see also Campanelli*, 44 Cal.App.4th at 576, 51 Cal.Rptr.2d 891.

█ In *Savage v. Pacific Gas & Elec. Co.*, a statement that plaintiff had "a conflict of interest" was held to be non-actionable opinion because "the determination of a conflict of interest involves instead an application of an ethical standard to facts, reflecting the exercise of judgement. The judgement may, of course, be reasonable or unreasonable; but whatever quality may be attributed to it, the expressed belief in the existence of a conflict of interest does not imply an objective fact that can be proved true or false." 21 Cal.App.4th 434, 444–45, 26 Cal.Rptr.2d 305 (1993).

MCA relies on the case *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). In that case, the defendant published a newspaper article that claimed plaintiff "lied at the hearing after . . . having given his solemn oath to tell the truth." *Id.* at 5, 110 S.Ct. 2695. The article essentially claimed that plaintiff had committed perjury. *Id.* The court held that there is no privilege for anything that might be labeled opinion. *Id.* at 18, 110 S.Ct. 2695. "A statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Id.* at 19, 110 S.Ct. 2695. However, this case merely sets the boundaries of federal limits to defamation suits. It does not purport to say what California law provides. The court found that the issue of whether plaintiff perjured himself could be ascertained factually under Ohio law. *Id.* at 21–22, 110 S.Ct. 2695. However, MCA must first state a claim for relief under California law, before it is necessary to determine the contours of additional federal law regarding permissible defamation actions.

Mattel relies on a post-*Milkovich* Ninth Circuit case, *Underwager v. Channel 9 Australia*, 69 F.3d 361 (9th Cir.1995). In *Underwager*, the defendant showed a videotape of an Australian news show in the United States at a conference that included footage of individuals disputing plaintiff's credentials and his scientific theories regarding child witnesses in sexual abuse cases. *Id.* at 363–64. The Ninth Circuit held that "to determine whether a statement implies a factual assertion, we examine the totality of circumstances in which it was made. First, we look at the statement in the broad context. . . . Next we turn to the specific content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false." *Id.* at 366. Even when one of the panelists accused plaintiff of "lying," the court found that such an obvious "exaggeration" did not "imply a verifiable assertion of perjury." *Id.* at 367. The statement was only "nonactionable rhetorical hyperbole, a vigorous epithet used by those who considered the appellant's position extremely unreasonable." *Id.*

*Underwager* suggests that even though there is not an absolute protection for opinion, there is still a great amount of protection for statements that are obviously "rhetorical

hyperbole" or an obvious "exaggeration." The statements made by Mattel fit within that broad category of statements. The public would see that the two companies were involved in a lawsuit. The public would expect a vigorous debate between both sides in the press. Such hyperbole is protected by the First Amendment, and is not subject to a defamation suit.

MCA also argues that Fitzgerald's statements amount to libel *per se* because he falsely accused MCA of committing a crime. MCA relies on *Gregory v. McDonnell Douglas Corp.*, for the proposition that there is no protection for "accusations that an individual has committed a crime or is personally dishonest." 17 Cal.3d 596, 604, 131 Cal.Rptr. 641, 552 P.2d 425 (1976). However, Fitzgerald merely employed hyperbole in his statement, and was not seriously suggesting that MCA had committed a bank robbery.

MCA further contends that Fitzgerald's comments are susceptible to being proven true or false. MCA relies on *Edwards v. Hall,* 234 Cal.App.3d 886, 285 Cal.Rptr. 810 (1991). In *Hall,* the defendant called plaintiff an "extortionist" and claimed that plaintiff "demanded $40,000" to avoid creating a controversy. *Id.* at 904, 285 Cal.Rptr. 810. The court noted that, standing alone, calling plaintiff an "extortionist" was "arguably hyperbolic," but that the statement regarding the demand for $40,000 could be proven true or false. *Id.* The specificity of the $40,000 allegation is quite different than the more opinionated and vague comments made by Fitzgerald. Fitzgerald's comments are not susceptible to be proven true or false. The comments were made soon after the suit was filed when there was a considerable amount of press interest. The articles and news shows that covered the issue wanted to illustrate the controversy between both sides, which is why they all featured comments from Fitzgerald, as well as from MCA employees. Thus, the comments were certainly of the type where the audience would "anticipate efforts by the parties to persuade others to their positions by use of epitaphs, fiery rhetoric or hyperbole." *See Baker,* 42 Cal.3d at 254, 228 Cal.Rptr. 206, 721 P.2d 87; *Campanelli,* 44 Cal.App.4th at 579, 51 Cal.Rptr.2d 891.

The statements that referred to MCA as a "bank robber" that committed a "crime," "heist," or "theft" cannot be seen as anything but hyperbole made in the middle of an attempt to convince the public of Mattel's side in the ongoing litigation. Like the comment made in *Campanelli* that the plaintiff had caused the players to be "beaten down and in trouble psychologically," Fitzgerald's statements are not such that they can be proven in any verifiable sense. This case is also like *Savage,* where defendant opined that the plaintiff was guilty of "a conflict of interest." In both situations the speaker was making a judgement, but was not making a statement that was susceptible to an objective determination of truth or falsehood.

"The courts of appeal that have considered defamation claims after *Milkovich* have consistently held that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment. As the Fourth Circuit noted 'because the bases for the conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related.' . . . Thus, we join with the other courts of appeal in concluding that when an author outlines the facts available to him, thus making it clear that the challenged statements represents his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Partington v. Bugliosi,* 56 F.3d 1147, 1156–57 (9th Cir.1995) (internal citations omitted).

That is precisely the situation in this case. All of the allegedly defamatory statements were made in the context of a news story or program where both sides of the this lawsuit were present to discuss the suit. Thus, the public obviously knew that each side believed strongly in their position. Fitzgerald's comments were all in response to statements by MCA, and he stated the background facts, such as that MCA used the "Barbie" name without permission from Mattel, before making his ultimate conclusion that such conduct was akin to theft.

Mattel's statements were non-actionable hyperbole, and are not capable of being proven true or false. As such, MCA's claim for defamation is dismissed.

## B. PUBLIC FIGURES AND ACTUAL MALICE

 Federal law also provides additional protection for statements made about a public figure. A plaintiff can become a public figure in one of two ways. "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Public figure plaintiffs "must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695.

### 1. MCA as a Public Figure

 MCA contends that it is not a public figure. MCA relies on *Vegod Corp. v. ABC,* 25 Cal.3d 763, 160 Cal.Rptr. 97, 603 P.2d 14 (1979). The court held that "a person in the business world advertising his wares does not necessarily become part of an existing public controversy. It follows those assuming the role of business practice critic do not acquire the First Amendment privilege to denigrate such entrepreneur." *Id.* at 770, 160 Cal.Rptr. 97, 603 P.2d 14. However, the court did note that in cases where individuals are found not to be public figures, they "never discussed the civil or criminal litigation with the press" or "[sought] publicity" on the issue. *Id.* at 769, 160 Cal.Rptr. 97, 603 P.2d 14. Likewise, the plaintiff in *Vegod* sought no publicity for running the close-out sale of a major department store. *Id.* However, MCA, a major entertainment conglomerate, sought out publicity both for its product, and about the lawsuit once it was filed. (Ex. E.) MCA engaged in a frontal assault in the news media to defend and promote the song in the face of the lawsuit. (Ex. E.) In addi-

tion, to promote the song, MCA sent out press kits on Aqua to 800 or more media outlets. (Stein Dep. at 54, 73, 150, 159–61.)

MCA also relies on *La Costa v. Superior Court,* which held that "merely because a corporation sells services to the public ... and merely because it employs and has access to the media to advertise its services ... does not mean that such an ability gives the corporation the status of one with greater power of persuasion on public issues." 106 Cal.App.3d 646, 660, 165 Cal.Rptr. 347 (1980). This case is distinguishable because the small corporation which ran one resort in *La Costa* is far different from an international conglomerate such as MCA. In addition, MCA sought out the media to promote its album, and then to defend itself from the lawsuit.

"As a general rule, public officials and figures can be said to have voluntarily exposed themselves to public scrutiny and must accept the consequences. A person is not a public figure merely because he happens to be involved in a controversy that is newsworthy. A public figure plaintiff must have undertaken some voluntary act through which he seeks to influence the resolution of the public issues involved.... In sum, when called upon to make a determination of public figure status, courts should look for evidence of affirmative actions by which purported public figures have thrust themselves into the forefront of particular public controversies." *Live Oak Publishing Co. v. Cohagan,* 234 Cal.App.3d 1277, 1289, 286 Cal.Rptr. 198 (1991). Here, MCA has attempted to thrust itself into the forefront of the dispute with Mattel over the song.

The California Supreme Court has held that "while any person or organization has the right to engage in publicity efforts and to attempt to influence public and media opinion regarding their cause, such significant, voluntary efforts to inject oneself into the public arena require that such a person or organization be classified as a public figure in any related defamation actions." *Reader's Digest Ass'n v. Superior Court,* 37 Cal.3d 244, 256, 208 Cal.Rptr. 137, 690 P.2d 610 (1984). The court focused on plaintiff's "massive publicity and self-promotion efforts over a period of many years" and the fact that such efforts

"increased ... with regard to the present controversy." *Id.* MCA has engaged in promoting itself and its products for many years. Such efforts increased at the time of the litigation, when MCA began sending out statements to numerous press outlets.

## 2. Actual Malice

■■■ "As a public figure, [plaintiff] must show by clear and convincing evidence that [defendant] in fact entertained serious doubts as to the truth of his statements or acted with a high degree of awareness of probable falsity." *Underwager,* 69 F.3d at 368. The actual malice standard is "subjective in nature, provable only by evidence that the defendant realized his statement was false or that he subjectively entertained serious doubts as to the truth of his statement." *Live Oak,* 234 Cal.App.3d at 1288, 286 Cal. Rptr. 198.

Mattel argues that MCA has provided no evidence, and certainly not clear and convincing evidence, that Fitzgerald had actual, serious doubts concerning the truth of his statements, nor that he acted recklessly in making such statements.[61] MCA contends that there is sufficient circumstantial evidence to allow a jury to conclude that malice is present.

California law defines "actual malice" as "that state of mind arising from hatred or ill will toward plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice." Cal.Civ. Code § 48a(4)(d). "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.... The meaning of terms such as 'actual malice' and, more particularly, 'reckless disregard' however, is not readily captured in one infallible definition.... The rule is premised on the

recognition that judges, as expositors of the constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgement that is not supported by clear and convincing proof of actual malice." *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685–86, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

MCA argues that the fact that Mattel sued MCA merely because a song poked fun at Barbie, is evidence that Mattel had ill-will and hostility for MCA. However, ill-will is not the standard for constitutional malice. *See id.* at 666, 109 S.Ct. 2678 ("It is also worth emphasizing that the actual malice standard is not satisfied merely through a showing of ill will or malice in the ordinary sense of the term.").[62] MCA must prove that Mattel knew the statement was false, or was reckless in not so determining. There is no evidence whatsoever, and certainly not clear and convincing evidence, that Fitzgerald or Mattel knew the statements were false. Thus, the only way that MCA can avoid summary judgement is if they show clear and convincing evidence of reckless disregard.

MCA argues that Mattel acted with reckless disregard for the truth because Fitzgerald lacked knowledge about trademark or defamation law. MCA also contends that Fitzgerald himself admitted that he did not think the song was put out by Mattel when he first heard it. Finally, MCA contends that Fitzgerald acted recklessly because he had no notes with him when he made the statements to the press, and then never retracted them once they were out. All of this evidence taken together is insufficient to show that Mattel acted with reckless disregard for the truth. At best, it shows some negligence. The Supreme Court has held

---

**61.** Mattel cites to a number of cases, dating back to 1894, where various courts have equated trademark violations with theft or stealing. Mattel also points to a brief filed by MCA and its counsel Mr. Frackman, in another case, where Mr. Frackman describes the violation of MCA's trademark as "thievery" and "stealing." These arguments are not helpful because the cases cited are not in the defamation context, and Mattel

seems to be making the assumption that there in fact has been a trademark violation.

**62.** Many of MCA's cases deal with malice in the situation of state privileges, and not malice in the constitutional defamation context. *See Sanborn v. Chronicle Pub. Co.,* 18 Cal.3d 406, 413, 134 Cal.Rptr. 402, 556 P.2d 764 (1976) (discussing malice in the context of Cal.Civil Code § 47(3).).

that "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Id.* at 668, 109 S.Ct. 2678.

MCA has the burden to show clear and convincing evidence of malice. As a public figure, MCA must meet a high burden to prove its defamation claim against Mattel. MCA has failed to do so.

## IV. CONCLUSION

For the forgoing reasons, the Court DENIES defendants' motion to dismiss foreign defendants for lack of personal jurisdiction, subject matter jurisdiction, and forum non conveniens.

The Court hereby GRANTS defendants' motion for summary judgment as to all of plaintiff's claims. The Court also GRANTS plaintiff's motion for summary judgment as to defendants' counterclaim for defamation. The Court DENIES plaintiff's motion for reconsideration of its Order denying plaintiff a preliminary injunction. To the extent plaintiff orally moved at the April 30th hearing for summary judgment on its trademark infringement claims, the Court DENIES that motion.

All previously assigned dates are vacated.